THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VICTOR DAVILLA, Defendant-Appellant.

First District (2nd Division)   No. 1—91—0314

Opinion filed September 29, 1992.—Rehearing denied October 28, 1992.

Genson, Steinback, Gillespie & Martin, of Chicago (Edward M. Genson and Marc W. Martin, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant, Victor Davilla, appeals his conviction for possession of a controlled substance with intent to deliver (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(a)(2)(D)), and his 90-year sentence in the custody of the Illinois Department of Corrections.

On January, 16, 1990, defendant, Louis Perez, Radames Flores, Richard VanMeter, and Jamie DeAvila were arrested and charged jointly with possession of a controlled substance with intent to deliver 900 grams or more of cocaine (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(a)(2)(D)), and nine counts of armed violence (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2); in addition, each of them, except VanMeter, was charged with nine counts of unlawful use of weapons by a felon (Ill. Rev. Stat. 1989, ch. 38, par. 24—1.1). They all waived their right to a trial by jury and were tried together.

Chicago police officer John Rossi (Rossi) testified that on January 16, 1990, he and his partner, Lawrence Heise (Heise), were "approached by an individual who told [them] he had information in regards to a man wanted by the police by the name of Victor Davilla[,] *** [and that Davilla could be found at] 6536 South Fairfield." Rossi testified that at approximately 9:30 a.m., he and Heise drove an unmarked Chevrolet Caprice to the 6600 block of South Fairfield, where they placed the residence located at 6536 under surveillance. During this time they saw no one enter or exit the house. They continued their surveillance until approximately 12:45 p.m., and resumed it at approximately 3:15 or 3:30 p.m. that afternoon. Upon their return they noticed, parked in front of the house, a blue and white van matching the description of the van that defendant was known to drive. Rossi then called police headquarters for tactical back-up, and once it arrived, he and Heise approached the residence.

As Rossi approached the house, he walked up the front stairs, stopped "on the mid-point of the stairs and looked inside of a window which faces north on the building," and through which he saw defendant sitting in front of a television set. Meanwhile, Heise stood "on the porch of the residence near the door, the front door." Rossi observed ·

the four codefendants sitting behind defendant, watching television. He testified that he saw, sitting on the floor next to defendant's feet, a black nylon bag.[1] He then whispered to Heise that defendant was inside and that Heise should knock on the door. When Heise knocked on the door and announced that he was a police officer, defendant "looked towards the door, *** picked up the black bag, *** and he got up along with the other subjects and began to run *** toward the rear of the house." The two officers then broke down the front door and began to pursue defendant, who "was still carrying the black nylon bag that he had picked up when I saw him get up out of the chair." Defendant and the others "ran up some stairs that were adjacent to the kitchen *** [and] into the attic"; Rossi and Heise followed behind. As Rossi and Heise entered the attic they noticed two codefendants fleeing from the attic; "Victor Davilla was still standing at the attic window[, and as Rossi] was still running towards him, he dropped that bag to the ground and then followed the other two defendants out the window." After defendant dropped the bag, Rossi looked into it and saw three brown, taped packages, as well as 13 smaller, clear plastic bags, some of which were located inside of a larger bag.

Picking up the nylon bag, Rossi ran back downstairs and out the front door, "and began looking up on the roof of the building," where he saw defendant running towards him. He then ordered defendant to come down, and after some time, defendant returned from neighboring rooftops to the roof of 6536 South Fairfield, from which he dropped to the ground. Rossi then handcuffed defendant and took him back inside the residence, where his codefendants were already handcuffed and sitting in the dining room. Upon reentering the residence, Rossi, still in possession of the black bag, was told by Heise that there was a large quantity of guns in the attic. After retrieving the guns from the attic, Rossi and Heise returned downstairs and Rossi handed Heise the black nylon bag. He further testified that at this time he did not see any women in the house. Rossi obtained Heise's keys to the squad car, which was then parked in the 6600 block of South Fairfield, and moved it "to the area of 6536 South Fairfield," after which he returned to the residence. He also testified that he was the only officer who searched the house, and that no officer searched defendant's van.

---

[1]Rossi did not mention in his police report that he had seen a black nylon bag at defendant's feet.

Rossi further testified that defendant and his codefendants were then transported to the ninth district tactical office, where he and Heise inventoried the items recovered: the black nylon bag containing the 13 smaller, clear plastic bags filled with a white residue, a larger plastic bag which held some of the 13 packets, three brown, taped packages, and nine guns.[2] Rossi, Heise and Officer Murray then counted and weighed the packages several times, arriving at a total weight of 4,575 grams. The contents of the nylon bag were then taken to the police crime lab for tests.

Officer Heise testified that he and his partner, John Rossi, were in the area of 65th and Fairfield on January 16, 1990, after having "received knowledge that a subject wanted on a warrant was in the area there." When he and Rossi arrived at 6536 South Fairfield, he "peered inside the window and *** observed subjects inside the front room of that house," so he went to the door, knocked on it, and when he announced his office, he heard the door lock and the suspects run. Within a matter of seconds he had forced entry into the house, where he discovered that he and Rossi were 10 to 15 feet behind the suspects. After the two officers began to pursue them, Heise noticed that defendant was carrying a "dark knap sack" as he ran; and while chasing the suspects to the attic, he observed the bag fall to the ground, but did not notice who dropped it. He then saw Rossi pick up the bag and run downstairs. While in the attic Heise observed some weapons piled on a blanket in the south corner of the building. Rossi later returned to the attic and gave Heise the black bag, which he held while they took the subjects downstairs. Heise estimated the street value of the powdery substance to be over $900,000, because of its high purity level.

Also testifying for the State was Linda Jenkins, an expert in the field of forensic chemistry for the Chicago police department, who testified that on January 24, 1990, she was given a black nylon bag sealed in a plastic bag. Inside the black nylon bag were 13 clear plastic bags and three taped blocks. She removed the white powder out of each of the individual 13 bags and the three taped blocks "so that the original plastic bags [and the blocks] could be submitted to laser for fingerprints." She "tested" only the three taped blocks and none of the contents of the 13 individual bags. Individually the blocks weighed 999.3 grams, 998.5 grams, and 989.6 grams, for a total weight of

---

[2]In the inventory reports for the guns, the police indicated that they had been recovered from defendant personally, although they were actually recovered from the attic of a home in which defendant did not reside.

2987.4 grams; the blocks tested positive for cocaine and were 89.3% pure. She further testified that all of the plastic bags were submitted for fingerprint testing but that no fingerprints were found.

At the close of the State's case, defendant, who was represented by attorneys Michael Spivack and Thomas Organ, and all four codefendants moved for a "directed finding and acquittal."[3] Organ, who also represented VanMeter and Flores, argued that none of his clients ever possessed any controlled substances or weapons. Jackie Ross, attorney for DeAvila and Perez, made similar arguments in behalf of her clients. The court held that the evidence

> "is clear on Victor, on Victor and Victor alone. The only other evidence you have is four other guys are watching [television] when somebody knocks on the door and says police and they run upstairs. *** Motion for a Directed Finding of Not Guilty as to Radames Flores, Louis Perez, Jamie DeAvila and Richard VanMeter is sustained as to the possession of controlled substance with intent to deliver, as to the armed violence and as to the appropriate charges of possession of a weapon by a felon. The remaining defendant, Victor Davilla, I think the State [sic] in the light most favorable to the State [sic] at this point has proven the defendant guilty of the offense of possession of controlled substance with intent. As to the armed violence, you didn't even come close to him in proving the armed violence. The Motion for Directed Finding as to the armed violence and the unlawful use of weapon by a felon is sustained."

Kina Hankins testified in behalf of the defendant that on January 16, 1990, she lived with Richard VanMeter at 6536 South Fairfield; that at approximately 5:30 p.m. she was in the kitchen with Gracie Zapata when she heard the front doorbell ring and saw the defendant, Flores, DeAvila, and Perez begin to run; that VanMeter was upstairs in the attic sleeping at this time, and before she could awaken him, the police were in the house; that she saw defendant running, but had nothing in his hands; that the police had told her, Zapata and VanMe-

---

[3] We find no provision in the Code of Criminal Procedure of 1963 or in the rules of the supreme court regarding the invocation of a "directed finding" in cases tried without a jury. However, there appears to have arisen among both bench and bar the curious notion that a trial judge may "direct" himself to make a "finding" at the request of a litigant. Heaven forfend, though, that we should be iconoclastic enough to shatter a practice that has evidently enjoyed such long-continued use as to become at least a quasi-prescriptive entitlement of litigants in civil and criminal cases alike—a quaint example of the role of folklore in the development of our law.

ter to be seated on the dining room floor; that the police were searching the house but she did not see them recover anything; that after the police had apprehended defendant and codefendants, they asked for everyone's car keys, but only Flores and Perez had any; that the police left the house with these keys; that she did not know why the police asked for the car keys, but about 15 minutes later the police who took the keys came back into the house carrying a "Jewel-like bag, *** a plastic bag, brown, tan Jewel bag, *** [containing] white stuff that looked like cocaine, *** [and] guns;" that she heard the police say, when they came back inside, "You can call off the mutts;" that this "Jewel-like" bag had not been in the house previously; that she had never seen any black canvas bag; and that there had been no weapons in the house.

Richard VanMeter, also testifying for defendant, stated that he lived at 6536 South Fairfield on January 16, 1990, and that he was sleeping in the attic at 5:30 p.m. when his girl friend, Kina Hankins, woke him up. After he went downstairs, there were 8 to 10 officers searching his house. The police officers took his keys and left the house for approximately 30 minutes, and when they returned, they were carrying some bags and rifles. Although he did not see the contents of the bags, he saw that the bags and the rifles were taken from a dark blue Chevrolet parked on the "other side of the street, across the street and two and a half houses over." VanMeter denied that the police recovered any controlled substances in his house, and testified that he heard the police say, "Now we got 'em."

Donna Ceropski, also called by the defense, testified that she lived across the street from VanMeter and saw the police breaking into the house across from hers, and when she went outside, she saw several squad cars parked in front and many neighbors watching. As she approached the sidewalk, she saw the police use a key to open the trunk of a dark blue Chevrolet that resembled a police car, "except that it had been there for a week." She saw them take a shotgun out of the trunk, but she never saw any Jewel bags or black canvas bags. When she asked one of the officers what the shotgun was, he responded, "[I]t wasn't a pogo-stick."

Julie Sekalias, another defense witness and a neighbor of VanMeter's, testified that she was in her dining room when she saw three white men walking in front of her house. She heard gun shots, and later, police came to her door and asked her if she knew to whom the cars in front of her house belonged. From a window in her house she saw three police officers remove a "tan or like a brownish paper color" package and rifles from the trunk of a blue car "parked in

front" of her house. She also testified that she heard the officers say "Yeah, yeah, now we got 'em."

The last witness for the defense, Richard Skerrett, another neighbor of VanMeter's, testified that he heard "all kind of noise outside on the street" on January 16, 1990. He stated that he went out into the street where he saw the police go to the trunk of a blue car and remove rifles and some bags from it, and say, "Now we got 'em."

The court concluded that

> "beyond a reasonable doubt \*\*\* the officers testified clearly and convincingly to me, at least, that they saw the defendant with a canvas bag run up the stairs and throw it to the ground, recovered it and found it to contain a large quantity of cocaine. The State has proven that to me beyond a reasonable doubt."

Accordingly, the court found defendant guilty of possession of a controlled substance with intent to deliver.

Prior to sentencing, defendant presented a motion for a new trial which was denied. A hearing in aggravation and mitigation was held, both sides having been furnished copies of the presentence investigation report. Because defendant had a lengthy record of convictions, some of which were drug related, and because of the large quantity of high-grade cocaine found on defendant, the trial court sentenced him to 90 years in the custody of the Illinois Department of Corrections, although the State had recommended a 60-year sentence. In sentencing defendant, the trial court made the following statements:

> "I find cocaine to be the worst drug every [sic] placed on society. I think that in another ten years, the actual results of what I consider the worst drug ever—and a heroin addict can live and won't die for 30 years. The life expectancy for a cocaine addict is something in the neighborhood of 4 years. I don't know what we are going to do about the war on drugs but I certainly do find from the evidence and the amount of drugs confiscated in this case that you are a major dealer in our community. \*\*\* I think the appropriate sentence in this case would be something like one thousand to three thousand years in the Illinois Department of Corrections. I can't sentence you to one thousand to three thousand years. But I think that is the only appropriate sentence."

Defendant filed a timely notice of appeal.

I

In his first assignment of error, defendant contends that the State failed to convict him beyond a reasonable doubt because "the State's

evidence on vital issues of fact was impeached and contradicted by impartial witnesses." For instance, on one occasion Rossi stated that he stood in the middle of the stairs peering into the window of 6536 South Fairfield while Heise was standing on the porch; while Heise testified that he, too, looked into the window while standing in the middle of the stairs, and then proceeded to the front porch to knock on the front door. And on another occasion Rossi testified that he had handed Heise the bag containing the cocaine when they were downstairs; yet Heise testified that Rossi had given him the bag while they were upstairs. And on still a third occasion Rossi testified that defendant had a black nylon bag sitting at his feet when he looked through the window but he failed to mention this in his police report.

Defendant further maintains that several of Rossi's and Heise's statements are incredible. For example, it could not have taken only a few seconds to break down the front door; therefore, the officers could not have been only 10 to 15 feet behind defendant once they entered the house after having broken down the front door. Also, it is unlikely both that only Officer Rossi searched the home and that none of the vehicles parked outside was searched by any of the officers.

Indeed, it is defendant's contention that the cocaine was seized from a car parked outside and not from inside the house, and thus the police were attempting to frame him. In support of this theory he relies on the testimony of VanMeter, Hankins and various neighbors who saw the police remove a tan package from the trunk of a blue Chevrolet. Although Rossi testified that defendant possessed the cocaine, the fingerprint analysis does not reveal defendant's fingerprints on the bags. Defendant also argues that as a matter of law Rossi's testimony that defendant held the bag for a short time does not suffice to prove guilt. See *People v. Darnell* (1990), 214 Ill. App. 3d 345.

It is not the function of a reviewing court to retry the defendant; rather, it is the duty of a reviewing court to reverse a conviction where the evidence is such that no rational trier of fact could have found a defendant guilty beyond a reasonable doubt (*People v. Collins* (1985), 106 Ill. 2d 237, 261, *cert. denied* (1985), 474 U.S. 935, 88 L. Ed. 2d 274, 106 S. Ct. 267), or where the evidence is "so palpably contrary to the verdict or the verdict is so unreasonable, unsatisfactory, or improbable as to raise a reasonable doubt of defendant's guilt." (*People v. Gomez* (1991), 215 Ill. App. 3d 208, 215-16, *appeal denied* (1991), 142 Ill. 2d 658, citing *People v. Boclair* (1989), 129 Ill. 2d 458, 474-75.) The evidence must be viewed, however, "in the light most favorable to the prosecution." (Emphasis omitted.) *People v.*

*Young* (1989), 128 Ill. 2d 1, 49, *cert. denied* (1990), 497 U.S. 1031, 111 L. Ed. 2d 798, 110 S. Ct. 3290.

▮ Viewing the evidence in such a light, we hold that defendant was found guilty beyond a reasonable doubt. The arguments defendant makes regarding the alleged inconsistencies between Rossi's and Heise's testimony are groundless. "[M]inor inconsistencies in testimony do not, of themselves, create reasonable doubt" (*People v. Richardson* (1988), 123 Ill. 2d 322, 353, *cert. denied* (1989), 489 U.S. 1100, 103 L. Ed. 2d 943, 109 S. Ct. 1577), and clearly, any discrepancies in testimony here are minor and insubstantial. Even though Rossi and Heise gave differing testimony regarding Heise's location when Rossi looked in the window and spotted defendant, both officers testified that Heise was the one who knocked on the door and announced their office. Moreover, the essence of both officers' testimony was that defendant was spotted inside the house before Heise knocked on the door and announced their office.

Also minor is the discrepancy regarding Rossi's location when he gave Heise the black nylon bag; it is immaterial whether the exchange occurred upstairs in the attic or downstairs in the dining room. In either event it is clear that Rossi was in possession of the bag from the time defendant dropped it to the time defendant was subdued. More important, both officers testified that they saw defendant carrying the bag while fleeing. It is also immaterial that Rossi did not include every minor detail in his police report; the critical fact at issue was mentioned in the report, namely, that defendant was seen carrying the bag while fleeing upstairs to the attic.

As for defendant's argument that some of Rossi's and Heise's statements were incredible, it must always be kept in mind that it is within the province of the trier of fact to assess the credibility of witnesses and to resolve conflicts in testimony. (*People v. Nitz* (1991), 143 Ill. 2d 82, 95; *People v. Jimerson* (1989), 127 Ill. 2d 12, 43.) Indeed, the court specifically found the officers' testimony to be clear and convincing regarding the fact that defendant was in possession of a canvas bag while running up the stairs. Thus, defendant's arguments that it would have been impossible for the police to break down the front door in two seconds, or for them to be 10 to 15 feet behind defendant, or for the police not to have searched the vehicles parked outside are irrelevant speculation, and as credibility issues, they merit no consideration on appeal.

Moreover, defendant's own theory that the cocaine was seized from a car parked outside is not supported by the record. Although the trial court found all of VanMeter's neighbors to be credible wit-

nesses, none of them was able to testify that the police took drugs out of the trunk of a car; all they could relate was that the police removed a tan bag from the trunk of a blue Chevrolet—they could not identify the contents of the bag. Also, the fact that defendant's fingerprints were not present on the plastic bags is not conclusive of his innocence, since other evidence existed sufficient to convict him, namely Heise's and Rossi's testimony.

Finally, defendant's argument, that "Rossi's testimony that [he] held the bag for a short time does not suffice to prove guilt," is unpersuasive. "In order to support a conviction for the unlawful possession of a controlled substance, the State must prove beyond a reasonable doubt that the defendant had knowledge of the controlled substance and that it was in his immediate and exclusive control." (*People v. Clark* (1988), 173 Ill. App. 3d 443, 448-49, citing *People v. Scott* (1987), 152 Ill. App. 3d 868, 870-71.) Defendant does not contend that he had no knowledge of the controlled substance, but rather, argues that the bag was not in his immediate and exclusive control. "Actual possession is proved[, however,] by testimony which shows the defendant exercised an act of physical dominion over the unlawful substance, ***." (*Clark*, 173 Ill. App. 3d at 449.) Clearly, defendant was in actual possession of the cocaine since both Rossi and Heise testified that they witnessed him carrying it. Therefore, taking all of this evidence into account, we hold that there was ample evidence to convict defendant beyond a reasonable doubt.

## II

In his second assignment of error, defendant urges that he was denied a fair trial.

## A

■ He first contends that "the trial court[ ] refuse[d] to give any consideration to the testimony of Kina Hankins," when during closing arguments it stated that it was "not even for a minute looking at [her] testimony." We note, however, that it is within the province of the trier of fact to weigh the credibility of witnesses, and the above-quoted comment merely reflects the trial judge's conclusions with respect to the credibility of Kina Hankins.

Defendant also contends that he was denied a fair trial because the court had "formed an adverse opinion regarding a defense witness [Richard VanMeter] before the close of all the evidence." Specifically, defendant complains of the trial judge's comments made during VanMeter's testimony:

"THE COURT: Don't look at me. I'm not—I just rule on the objections. You just answer the question. Don't be so snotty. You're doing a bad job at this time. Let's—he's asking you questions. Just try to refrain from being snotty. I know that you had a tough time and maybe you don't think you were treated properly, but I also think that you should show some respect to members of law enforcement, and it's obvious to me you have none.

THE WITNESS: I'm sorry."

The State asserts that defendant has waived this issue on appeal because he failed to object to it at trial and to raise it in his post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) While it is true that defendant neither objected to Judge Himel's statement nor raised the issue in his post-trial motion, "application of the waiver rule is less rigid where the basis for the objection is the trial judge's conduct." (*People v. Nevitt* (1990), 135 Ill. 2d 423, 455.) Therefore, assuming, *arguendo*, that this issue was properly preserved, we address the merits of his contention.

Defendant urges that this case is on all fours with *People v. Kennedy* (1989), 191 Ill. App. 3d 86, in which Judge Himel was reversed on appeal for failing to afford the defendant a fair trial. In *Kennedy*, at the close of the evidence, Judge Himel "classified the defense witnesses as thieves, drug addicts, fornicators and welfare recipients. However, nothing in the record support[ed] these classifications." (*Kennedy*, 191 Ill. App. 3d at 91.) Acknowledging that a trial judge may comment on the credibility of the witnesses at the close of evidence, the court found that Judge Himel was not "merely commenting upon the credibility of the defense witnesses," rather, he was formulating "certain preconceived notions regarding people who wear leather coats, live together, are unemployed and [are] on welfare. These notions made him unwilling to believe the testimony of the defense witnesses." (*Kennedy*, 191 Ill. App. 3d at 91.) The court concluded that "the trial judge harbored preconceived notions regarding the veracity of the defense witnesses which led him to reject defendant's alibi defense without due consideration." *Kennedy*, 191 Ill. App. 3d at 91.

We find, however, that defendant's reliance on *Kennedy* is unwarranted. There, Judge Himel's comments reflected, as the appellate court stated, that he "harbored preconceived notions regarding the veracity of defense witnesses." Here, however, the judge's comments do not express a prejudgment of the case or suggest any preconceived

notions regarding VanMeter's veracity; rather, he was merely admonishing the witness that his demeanor on the witness stand toward the prosecutor was inappropriate. Surely, defendant does not dispute that a trial judge has the inherent authority to maintain decorum and to require civility of not only the parties to the case and their attorneys, but to witnesses as well.

## B

Defendant further contends that he was denied a fair trial when the trial court impermissibly conducted a private investigation by asking the prosecution "several questions designed to adduce answers predicated upon information not in the record." He relies, in part, upon *Kennedy* (191 Ill. App. 3d 86), the facts of which have already been detailed above, and in which Judge Himel was also found to have considered information outside the record in order to evaluate the credibility of the defendant's witnesses. He also relies, in part, upon *People v. Harris* (1974), 57 Ill. 2d 228, where the defendants claimed error based on what occurred at the conclusion of their testimony. In a separate and earlier trial, they had been tried for possession of marijuana. The judge in the later trial asked the assistant public defender whether the defendants told the public defender's office, when they were tried on the marijuana charge, that they had attended a party on the evening in question. The defense attorney, who had not represented the defendants at the earlier trial, said his notes on the matter on trial showed that the defendants had told him they had been at a party on the evening in question. The judge then asked again if the defendants had told of the party when they had first seen a public defender, and when told by the attorney that he did not know and that an answer to the court's question could not be obtained, the trial judge said: "Then I can't believe them. That's all." (57 Ill. 2d at 231.) On review the *Harris* court determined that by asking such questions the trial court was conducting a private investigation and was improperly considering matters not in evidence.

Defendant also relies upon the following colloquy between the trial judge and the prosecution during closing arguments:

> "THE COURT: Let me just ask you one question before you go on. Did you ever ask—are any of the police officers here today?
>
> MR. FORD: Judge, they're on phone call right now.
>
> THE COURT: I just want to know, have you—I have asked—you had the names of these witnesses prior to today's date, possibly had someone talk to them. I don't know whether

you did or not. I don't know when you found out. This is—is there any communication with the officers in regards to the conversation that these civilian neighbors had with the police such as 'It's not a pogo stick, lady'? Is there a chance that maybe that officer has talked to and maybe can shed some light on that conversation and maybe shed some light on—she was pretty clear. She was standing right there. However, she does contradict the other two witnesses. She said it was one officer that went to the dark blue Chevy with the key, opened the trunk. And she says all they got out of the trunk was a rifle, and she asked what it was, and he said, 'It ain't a pogo stick, lady.' Did anyone ever try to find out who that officer was in light of the fact that the officers did testify that they made no searches of the cars?

MR. FORD: Well judge, I would submit that's not a search of that car. *That was a police vehicle. What's important is officer Rossi did testify that he had been out there previously.*

THE COURT: *It would be nice for me to know that they had a surveillance vehicle parked out in front of the house for a week.*

MR. FORD: *Officer Rossi, if you recall, the question was asked of him, 'How long had you been looking for Victor Davilla,' and he said for a time period of about a week or two weeks prior to the time he saw—finally caught up with Victor Davilla. He had been staking out 6536 South Fairfield.*

THE COURT: Then it's your position at this time that the police went out there and recovered this weapon and some other packages before they got the gentleman?

MR. FORD: *It's my position that that's a police car.*
* * *

THE COURT: I agree with you. The testimony by the civilian witnesses is totally consistent except for, as Mr. Organ so amiably pointed out, is that they specifically cross examined these officers, and I remember that. It's specific cross examination about the search of the house after the guns were found on a blanket, and the drugs found after chasing Victor upstairs, and about searching cars on the street. The questions were specific. The officers definitely are contradicted.

MR. FORD: Contradicted to the extent they said they didn't search a car. What happened? They had a key. They opened the trunk with a key, and as Miss Ceropski ably points out, one officer took out one gun. Now, everyone—

THE COURT: *Are you telling me this from personal knowl-edge, such as you talked to one of these officers, or are you just arguing a reasonable inference to be drawn from the testi-mony?*

MR. FORD: *Judge, this is—I can't testify as to what any conversations—*

THE COURT: *I want to know if you're answering this ques-tion like you know it from talking to the police officer.*

MR. FORD: *I know what kind of vehicle the officer was in that evening. And I also know he had been there before, and I know that Officer Rossi walked in here and testified that he saw Victor Davilla throw that bag down. And no one—none of the civilians contradict that, not one of them. Not one of them, Judge. All of them were out in the streets. The events that they saw happen happened [sic] well after the fact."* (Emphasis added.)

■ The State alleges that defendant has waived this issue since he neither objected to it at trial nor raised it in his motion for a new trial; but, such a position is untenable in light of the facts in this case. As we have already indicated above, "[G]iven the fundamental impor-tance of a fair trial and the practical difficulties involved in objecting to the conduct of the trial judge, the waiver rule is applied less rig-idly." (*People v. Heidorn* (1983), 114 Ill. App. 3d 933, 936; see also *Nevitt*, 135 Ill. 2d at 455.) Moreover, the record shows that defendant *did* raise this issue in his motion for a new trial. Accordingly, we de-cline to view this issue as waived on appeal.

■ In a bench trial a judge is presumed to have considered only competent evidence in making her finding. (*People v. Tye* (1990), 141 Ill. 2d 1, 26; *People v. Gilbert* (1977), 68 Ill. 2d 252, 258; *Harris*, 57 Ill. 2d at 231; *People v. Wallenberg* (1962), 24 Ill. 2d 350, 354.) It is clear, too, that a trial judge in her deliberations is limited to the rec-ord made before her at trial, and should she draw conclusions based on any private investigation made by her, the accused will have been denied due process of law. (*Tye*, 141 Ill. 2d at 26; *People v. Yarbrough* (1982), 93 Ill. 2d 421; *Gilbert*, 68 Ill. 2d at 258-59; *Harris*, 57 Ill. 2d at 231; *Wallenberg*, 24 Ill. 2d at 354.) However, based on the record made in this case, we cannot conclude that Judge Himel went outside the record or conducted a private investigation in search of reasons to help him make up his mind about the sufficiency of the evidence. (*Yarbrough*, 93 Ill. 2d at 429.) This case is unlike *Wallenberg*, in which the court relied upon its own personal knowledge of an alleged alibi location in order to reject the defendant's testimony. Neither is it sim-

ilar to *Harris,* in which the trial judge questioned defense counsel about admissions made in a prior trial. Here Judge Himel posed questions to the prosecutor in order to clarify evidence already of record. He requested the State to explain its interpretations of the evidence, and made certain that those interpretations were supported, not by "personal knowledge [gained from having spoken] to one of these officers," but by evidence already of record.

### C

Defendant advances a third instance in support of his contention that he was denied a fair trial: that the prosecutor improperly relied on facts not in evidence to conclude that (1) the blue Chevrolet parked in front of 6536 South Fairfield from which the police removed a rifle and a tan bag was a police vehicle, and that (2) the police "had been looking for [defendant] for about a week or two weeks prior to the time he saw—finally caught up with [him]. He had been staking out 6536 South Fairfield."

Here again, the State argues that defendant waived this issue on appeal because he did not object to it at trial or raise it in his motion for a new trial. Even though defendant did not object to the prosecution's statements at trial, for the reasons previously cited, and "given the fundamental importance of a fair trial" we shall address the merits of his argument. "The prosecutor may not make arguments or assumptions which are not based upon the evidence, and it is highly improper for the prosecutor to misstate the evidence in his or her argument. [Citations.] This is especially true during rebuttal argument, as then defense counsel has no opportunity to make a response." (*Heidorn,* 114 Ill. App. 3d at 938.) "A prosecutor must confine his arguments to the evidence and to 'reasonable inferences' that follow from it" (*People v. Linscott* (1991), 142 Ill. 2d 22, 38); but in closing argument, the prosecution may rely on its evidence, to the exclusion of defense evidence. (*Heidorn,* 114 Ill. App. 3d at 939.) "Prosecutorial misconduct in closing argument warrants reversal of the conviction and a new trial if the improper 'remarks *** constitute[d] a material factor in the conviction,' [citations]" that is, "whether 'the [trier of fact] could *** have reached a contrary verdict had the improper remarks not been made.' [Citation.] If a reviewing court 'cannot say that the prosecutor's [improper] comments did not contribute to the defendant's conviction[ ],' the court should order a new trial. [Citation.]" *Linscott,* 142 Ill. 2d at 28.

However, we are satisfied that in this case the prosecutor "confine[d] his arguments to the evidence and to 'reasonable infer-

ences' that follow[ed] from it," and that if any improper remarks were made, they were not a material factor in defendant's conviction. It was the prosecution's theory that when defendant's witnesses saw the police enter the trunk of a blue Chevrolet and remove a tan bag and some rifles, they were entering their own police vehicle, rather than conducting a search of defendant's or one of his codefendants' vehicles, and that theory is supported by the record. First, one of defendant's witnesses, Donna Ceropski, testified that the car from which she saw the police remove a shotgun resembled a police car, except that it had "been there for a week"; and second, Rossi had testified that he and Heise were driving an unmarked Chevrolet Caprice on January 16, 1990, and that after they had subdued defendant, he moved the unmarked car from the 6600 block of South Fairfield to 6536 South Fairfield.

As for the prosecution's statement that the police had been staking out 6536 South Fairfield because they had been looking for defendant for a week or two, it, too, was a reasonable inference to be drawn from the evidence. On November 30, 1989, defendant was sentenced to serve a nine-year term for possession with intent to distribute, and a warrant had been issued for his arrest. Indeed, Rossi testified that prior to January 16, 1990, defendant was wanted by the police. Therefore, it is reasonable to infer that since defendant was wanted by the police prior to January 16, 1990, they would have been looking for him, and that therefore the police would have staked out 6536 South Fairfield.

But even if it were improper to infer that the police had staked out 6536 South Fairfield for one or two weeks, this statement was not a material factor in defendant's conviction. "To merit reversal, *** a prosecutor's improper comments must be of 'substantial magnitude' when viewed in the context of the entire record and argument. [Citation.] *** [I]f the improper comments did not constitute a material factor in the conviction of defendant, the verdict will not be disturbed." (*People v. Scott* (1990), 194 Ill. App. 3d 634, 645, *appeal denied* (1990), 132 Ill. 2d 552.) In light of the evidence against defendant, we cannot say that the prosecution's contention that a police car was located in front of 6536 South Fairfield for one or two weeks because the police had placed defendant under surveillance was so prejudicial as to require a reversal of his conviction. Any error alleged to be reflected in this statement would have to be considered harmless, considering the court's analysis of the evidence:

> "[B]eyond a reasonable doubt *** the officers testified clearly and convincingly to me, at least, that they saw the defendant

with a canvas bag run up the stairs and throw it to the ground, recovered it and found it to contain a large quantity of cocaine. The State has proven that to me beyond a reasonable doubt.

The testimony of all the witnesses for the defense I find to be corroborate [*sic*] in many instances the testimony of the police officers, and in certain instances it certainly does impeach that testimony. But it does not deter the—the Court—the State has convinced the Court beyond a reasonable doubt that [defendant] is guilty of the offense of possession of a controlled substance with intent to deliver."

Consequently, we find that defendant was not denied a fair trial.

### III

■ In his third assignment of error defendant maintains that his counsel "had conflicting loyalties which adversely affected" his representation, because one of his attorneys, Organ, also represented Flores and VanMeter; he thus claims a new trial to be necessary. Although the State argues that defendant has waived this issue on appeal for neither objecting to it at trial nor raising it in its motion for a new trial, "absent post-trial review by an independent attorney, appellate review of a defense counsel's conflict of interest is not waived by the failure to raise the issue in a post-trial motion." (*People v. Washington* (1982), 111 Ill. App. 3d 711, 713, *aff'd* (1984), 101 Ill. 2d 104, *cert. denied* (1984), 469 U.S. 1022, 83 L. Ed. 2d 367, 105 S. Ct. 442.) Since the record does not reflect that such a review occurred, we conclude that defendant has not waived this issue on appeal.

In situations where multiple representation exists, "a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." (*Cuyler v. Sullivan* (1980), 446 U.S. 335, 350, 64 L. Ed. 2d 333, 348, 100 S. Ct. 1708, 1719.) "[W]here a defendant alleges ineffective assistance of counsel due to conflicts arising from joint representation of codefendants, the *per se* standard is not applicable." (*Washington*, 101 Ill. 2d at 112, citing *People v. Berland* (1978), 74 Ill. 2d 286, 304; *People v. Echols* (1978), 74 Ill. 2d 319.) In such an instance "a defendant must demonstrate 'an actual conflict of interest manifested at trial.'" *Washington*, 101 Ill. 2d at 112, quoting *People v. Berland* (1978), 74 Ill. 2d 286, 304.

Considering the circumstances of this case, however, we are convinced defendant cannot show that an actual conflict existed at trial. In *People v. Martinez* (1982), 104 Ill. App. 3d 990, 992, the court reviewed "some of the situations that Illinois courts have found to create 'actual' conflicts of interest":

"(1) In a joint trial the same attorney cannot represent two co-defendants who have antagonistic defenses. (*People v. Wilder* (1977), 48 Ill. App. 3d 13, 15, 362 N.E.2d 436.) (2) In a joint trial, a defendant whose testimony is antagonistic to the interest of a co-defendant has a conflict of interest with that co-defendant. *** [Citation.] (3) In a joint trial, where one defendant's out-of-court statement is introduced against the other defendant, there is an actual conflict of interest even though the declarant may deny making the statement. In this situation, the defense has been impaired because the attorney for both defendants cannot adequately impeach the defendant who made the statement. (*People v. Cade* (1981), 97 Ill. App. 3d 354, 357, 422 N.E.2d 1002.) (4) Where an attorney successfully argues for the inclusion of fingerprint evidence and the evidence tends to exculpate one defendant but incriminate a co-defendant ***. (*People v. Echols* (1978), 74 Ill. 2d 319, 325, 385 N.E.2d 644.)" *Martinez*, 104 Ill. App. 3d at 992.

The facts of this case do not fit within any of the above-described instances of actual conflict. First of all, defendant was represented by two attorneys, Organ and Spivack. While it is true that Organ represented Flores and VanMeter as well, Spivack represented defendant only. Thus, defendant had at least one attorney who could best represent solely his interests. Second, nothing in the record supports the conclusion that during the State's case in chief Organ and Spivack failed to vigorously cross-examine witnesses on behalf of defendant; or to require the State to prove its case beyond a reasonable doubt; or otherwise failed to lay the groundwork for defendant's defense. Third, by the time defendant presented his case in chief, all of the charges against his codefendants had been dismissed, as well as all of the charges against him with the exception of possession with intent to deliver. Hence, when it came to presenting evidence on his behalf, no one remained against whom he could have an antagonistic defense. Moreover, both defendant's and codefendants' stories supported each other—they all asserted that no cocaine or guns were found in the house. Therefore, because "no material hostility existed at trial between [defendant and] codefendants and [because] the record presents no indication that [defendant's] defense *** was inhibited by the joint representation, a reversal of [his] conviction is not required." *People v. Schaefer* (1989), 188 Ill. App. 3d 317, 321.

## IV

In his fourth assignment of error, defendant maintains for

several reasons that his sentence ought to be vacated. First, he contends that he did not receive the presentence report three days before sentencing as required by section 5—3—4(b)(3) of the Uniform Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—3—4(b)(3)). Assuming, *arguendo*, that this issue was properly preserved, since he failed to object at the sentencing hearing or to ask for a three-day continuance to review and respond to the report, he has not argued that "the presentence report [was] *** in any way inaccurate, incomplete, or prejudicial." (*People v. Spurlark* (1978), 67 Ill. App. 3d 186, 203.) Therefore, we reject his argument on this issue.

Defendant also argues that the trial judge abused his discretion in sentencing him to 90 years in the custody of the Illinois Department of Corrections. Although the State maintains that defendant has waived this argument by not objecting to it at the sentencing hearing and by not raising it in his motion for a new trial, such argument is unwarranted. Defendant could not have raised a sentencing issue in his motion for a new trial, since such a motion is properly argued prior to sentencing; moreover, there is no requirement that he file a separate motion for a new sentencing hearing in order to preserve possible sentencing errors for review. *People v. Hargis* (1983), 118 Ill. App. 3d 1064, 1083, *rev'd on other grounds, People v. Daugherty* (1984), 102 Ill. 2d 533.

■ Although defendant has properly preserved this issue for appeal, we find his argument to be without foundation. He first argues that the judge improperly based the severity of his sentence on the gram weight of the untested substances. Chemist Jenkins testified on behalf of the State that she "tested" three packages, for a total gram weight of 2,987.4 grams. It is unclear from her testimony, however, whether "tested" means only a quantitative weighing or includes a qualitative examination of the substances found in the packets. Viewing the evidence in favor of defendant, however, only one package was clearly tested for the presence of cocaine. That package weighed 999.3 grams and was 89.3% pure. Even so, defendant was nonetheless found to be in possession of at least 999.3 grams of cocaine, more than the requisite amount under section 401(a)(2)(D) of the Controlled Substances Act (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(a)(2)(D)) (900 grams or more).

Defendant further asserts that the trial judge improperly relied on his personal opinions regarding the social value of cocaine and his own knowledge about the drug, rather than on facts in the record in sentencing him, and thus abused his discretion. He also suggests that the trial judge abused his discretion by not balancing the need for ret-

ribution against the potential for rehabilitation, and by superseding the State's recommended sentence of 60 years. Defendant also argues that the prosecution made inappropriate comments about his heritage, mischaracterized his prior conviction *in absentia* as a "bail jump," and accused him of illegally importing the cocaine from Mexico between November 1989 and January 1990.

It is within the discretion of the trial court to sentence a defendant, and absent an abuse of discretion, that sentence will not be altered by a reviewing court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153.) The sentence here is clearly within the statutory guidelines. Section 401(a)(2)(D) specifically states that anyone found with 900 grams or more of cocaine "shall be sentenced to a term of imprisonment *** [for] not less than 15 years and not more than 60 years." (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(a)(2)(D).) Section 408, however, provides that a "person convicted of a second or subsequent offense under this Act may be sentenced to imprisonment for a term of up to twice the maximum term otherwise authorized." (Ill. Rev. Stat. 1989, ch. 56½, par. 1408.) Defendant was previously convicted in 1988 of possession with intent to deliver more than 500 grams of cannabis, for which he was sentenced to one year's probation. In October of 1989, he was found guilty of possession with intent to deliver more than 100 grams of cocaine and was sentenced in November of 1989, *in absentia*, to serve nine years in the Illinois Department of Corrections. It was therefore within the trial judge's discretion to sentence defendant to a term of up to 120 years; accordingly, the imposition of a term of 90 years was within his discretion.

We also find that the trial judge did not abuse his discretion in relying on his own background and experience in sentencing defendant. In *People v. Tye* (1990), 141 Ill. 2d 1, 20, the trial judge relied upon his experience as a homicide detective in the City of Chicago to conclude that he had " 'never seen a child beaten with such viciousness, repeatedly beaten over an hour to the extent her death was caused,' " and to sentence the defendant to death. The defendant appealed, arguing that such reliance was improper. Citing *Barclay v. Florida* (1983), 463 U.S. 939, 77 L. Ed. 2d 1134, 103 S. Ct. 3418, the court concluded, however, "that a sentencing authority's decision whether to impose the death penalty need not be divorced from the sentencer's own background and experience in life. Indeed, it is precisely that experience that grounds the decision in a particular case in the value system of the community." (*Tye*, 141 Ill. 2d at 23.) We believe such an analysis to be equally applicable in the case at bar; we therefore conclude that the trial judge acted within his discretion. With re-

spect to the alleged improper comments made by the prosecutor regarding defendant's heritage and prior conviction, the court explicitly stated that it was "not considering these conclusions"; therefore, they were not a material factor in defendant's sentence. Consequently, we find the sentence to have been proper.

## V

On appeal the State requests that this court remand the case so that the trial court may impose the "mandatory" fine required by statute and which was requested by the prosecutor at the sentencing hearing. At the sentencing hearing the prosecutor specifically stated that he "would also be asking for a fine commensurate with the street value which was produced during the course of the trial which I believe is in the area of one million dollars"; but when sentencing defendant, the trial judge mentioned nothing about a fine, and the prosecutor did not raise an objection or ask for clarification.

■ It is the State's position that this court is without discretion and must remand this case because section 5—9—1.1 (Ill. Rev. Stat. 1989, ch. 38, par. 1005—9—1.1)[4] requires that a fine be imposed. We disagree. Supreme Court Rule 604(a)(1) (134 Ill. 2d R. 604(a)(1)) severely limits the State's right to appeal; nowhere, however, does the rule provide for an appeal "to contest the propriety of the sentence imposed on a criminal defendant." (*People v. Kent* (1976), 40 Ill. App. 3d 256, 266; see also *People v. Williams* (1985), 131 Ill. App. 3d 597, 612; *People v. Kurtz* (1967), 37 Ill. 2d 103 (decided pursuant to Ill. Rev. Stat. 1965, ch. 38, par. 120—1 and Supreme Court Rule 27(4), the predecessors of Supreme Court Rule 604).) As noted in *Kent*, "[i]n urging [this contention,] the State is here in the posture of an appellant," but the rule "strictly limits the State's right to appeal. *** Had defendant not brought this appeal, the State thus could not even have suggested the issue it seeks to present." *Kent*, 40 Ill. App. 3d at 265-66.

---

[4]Section 5—9—1.1 reads as follows:

"When a person has been adjudged guilty of a drug related offense involving possession or delivery of cannabis or possession or delivery of a controlled substance as defined in the Cannabis Control Act, as amended, or the Illinois Controlled Substances Act, as amended [Ill. Rev. Stat. 1989, ch. 56½, par. 1100 *et seq.*], in addition to any other penalty imposed, a fine shall be levied by the court at not less than the full street value of the cannabis or controlled substances seized." Ill. Rev. Stat. 1989, ch. 38, par. 1005—9—1.1.

In conjunction with this issue, the State requests leave to cite additional authority, and although we grant such leave, we find the proffered authority, *People v. Schott* (1991), 145 Ill. 2d 188, 201, to be totally inapplicable.

Accordingly, for the above-stated reasons, we affirm the decision of the trial court with respect to both defendant's conviction and his sentence, and reject the State's request for a remand for additional sentencing.

Affirmed.

HARTMAN, P.J., and McCORMICK, J., concur.