FOURTH DIVISION
 DECEMBER 26, 1996













No. 1--95--3549

THE PEOPLE OF THE STATE OF ILLINOIS,

 Plaintiff-Appellee,

 v.

NICHOLAS HEIMAN,

 Defendant-Appellant.)
)
)
)
)
)
)
)
)Appeal from the
Circuit Court of
Cook County

No. 94--CR--20387

Honorable
Ronald A. Himel,
Judge Presiding.

 JUSTICE CERDA delivered the opinion of the court:
 Following a bench trial, defendant, Nicholas Heiman, was
convicted of the first-degree murder (720 ILCS 5/9-1(a)(2)(West
1992) of Erven Etcheson and was sentenced to 55 years'
imprisonment. On appeal, he asserts that (1) he was not proven
guilty beyond a reasonable doubt; (2) he did not receive a fair
trial because of the trial court's bias toward him and his
witnesses; (3) he was denied effective assistance of counsel
because the trial court would not allow his attorney to present a
proper closing argument; and (4) the trial court made findings of
fact not supported by the evidence. We reverse and remand for a
new trial because the trial court's conduct denied defendant a
fair trial.
 Norma Hampton, the victim's fiance, testified that she and
Etcheson met defendant and his wife, Twila, at a neighborhood bar
at 7 p.m. on July 9, 1994. After drinking and socializing for a
couple of hours, Hampton and Twila drove defendant home because
he said he was drunk, then met Etcheson at another bar. When
they arrived, Etcheson was talking to Dennis King, whom Hampton
had never met. After that bar closed, King, Etcheson, and the
two women went to another bar, where they stayed until 3:40 a.m.
 King drove everyone home. When he arrived at Twila's
apartment building, defendant was standing on the corner. 
Defendant dragged Twila from the car, then punched her a couple
of times causing her to fall to the ground. King grabbed a tire
iron from under the car seat, got out of the car, and tried to
hit defendant with the tire iron, but defendant grabbed it from
him, then chased him back to his car.
 After King sped away, defendant returned to the location
where Hampton and Etcheson were attending to Twila. Etcheson
remarked, "Nick, don't you think that's enough," and defendant
struck him with the tire iron using a round, sweeping, sidearm
action. The two men were facing each other and the blow landed
at the rear base of Etcheson's skull, causing him to fall. 
 Hampton ran to call 911. When she returned, defendant was
cussing at her from across the street and Twila was holding
Etcheson's head. Etcheson was unconscious and having
convulsions. The next night, defendant left a message on
Hampton's answering machine, "Bitch, you're dead, bitch."
 Dr. Cynthia Porterfield, the Cook County Deputy Medical
Examiner who performed the autopsy on Etcheson, testified that
the only external injury was an abrasion on the back of the right
side of his head. There was no skull fracture, but there was
bleeding between the scalp and the skull on the back of his head. 
On the right side of his brain was a small subdural hematoma,
which is bleeding between the membranes surrounding the brain. 
There was also swelling of the brain and blood in the brain's
ventricles. It was Dr. Porterfield's opinion that death resulted
from cerebral injuries caused by blunt trauma to the head and
Etcheson's wounds were consistent with his being struck with a
tire iron.
 Chicago Police Detective John Boyle was assigned on July 11,
1994, to investigate an aggravated battery on Etcheson. He
testified that he interviewed Hampton and Twila, but could not
find defendant. Five days after Etcheson died, defendant called
Boyle and admitted being involved in the incident. He told Boyle
that he did not intend to kill Etcheson, who was a friend, and
had thrown the tire iron on the roof of the building across the
street from the incident. 
 Defendant tendered Dr. Paul W. Geiger, a general
practitioner and the father of defendant's attorney, as an expert
in the field of emergency medical care, which Dr. Geiger
practiced intermittently during his 29 years as a physician. 
Although the trial court expressed reservations about Dr.
Geiger's relationship to the defense attorney, he was
nevertheless qualified as an emergency medical care expert. The
court stated as follows:
 "I certainly find a vast amount of training here. I am
 more bothered by the relationship which shows an
 interest or bias.
 I am going to let him testify with the thought in
 mind that my wife, my son, or my father could not
 practice in this courtroom, nor do I think it is a
 proper thing to -- you know, especially if you are not
 even going to pay your dad, to have him come in and
 testify. It certainly does show to me at least an
 indication that it might be a little more favorable to
 the son's position. But I will allow you to ask
 questions of your father as an expert in emergency
 care."
 The defense attorney then attempted to question Dr. Geiger
about any remuneration the defense attorney was receiving for his
services. The assistant State's Attorney objected on the basis
of relevancy and the defense counsel countered that it went to
the witness's credibility. The court sustained the objection and
stated:
 "I don't think it goes to his credibility. What you
 have been paid I don't think goes to your dad's
 credibility."
 Dr. Geiger's testimony was based on his review of the
hospital records and autopsy findings, which indicated that the
only external injury was the abrasion at the back of Etcheson's
head. Dr. Geiger estimated that he had treated five to 15
persons who had been hit by a tire iron. The trauma flow sheet
indicated that Etcheson had a three inch hematoma at the back of
his head, but did not mention any laceration or skull fracture. 
Dr. Geiger explained that the hematoma could not be seen, but
could be felt under the skin. Dr. Geiger testified that every
person he had ever treated for a tire iron injury to the head had
scalp lacerations that required stitches. The following then
occurred:
 "[DEFENSE ATTORNEY]: Within a reasonable degree of
 medical certainty, if you and I are facing each other
 and I swing this at you, can I inflict that abrasion
 wound on you?
 [ASSISTANT STATE'S ATTORNEY]: Objection. He is not an
 expert in the field of forensic pathology. He is going
 way far afield.
 [DEFENSE ATTORNEY]: This is not a question regarding
 forensic pathology.
 THE COURT: I want to hear the answer. I want to hear
 what he bases the answer on. I want to hear how
 counsel can make the statement that -- so far it's
 clear to me that no one knows how the tire iron, other
 than it was a roundhouse swinging, where the tire iron
 landed; what part of the tire iron landed on the head,
 if in fact it did; if it was a glancing blow; if it was
 thrown; if it hit in one place and that touched the
 skull first, and then another portion, as could happen
 if it was in a twisting fashion.
 There are so many possibilities that I am really
 dying to hear how this expert can render this opinion."
 Dr. Geiger then stated that it was his opinion that someone
facing Etcheson could not have caused the abrasion, which was
larger than the surface of the tire iron, by striking him in the
back of the head with the tire iron. When asked whether the blow
had to be a glancing blow that dragged across the surface of the
skin, Dr. Geiger testified that he could not imagine that
happening. The trial court interrupted the questioning to
remark:
 "THE COURT: Well, why don't you just take the tire
 iron, swing it, and have it hit the table in front of
 you, and see all the different ways it can bounce off
 the wood, and how many marks are going to be made on
 it; if that is what your [sic] basing your opinion on,
 gee whiz."
 [DR GEIGER]: I am sorry. I don't understand.
 THE COURT: Nor do I understand your testimony here."
 Dr. Geiger then stated that the abrasion was consistent with
a fall on a flat object and Etcheson's CT scan showed blood in
his sinuses, which would have been caused by a blow to his face. 
Dr. Geiger thought it would be extremely unusual for a blow to
the back of the head to cause bleeding in the sinuses because the
sinuses are separated from the brain by a quarter-inch thick
bone. 
 Dennis King, an eyewitness, testified that he met Etcheson
at a bar around 8:30 or 9 p.m. on July 8, 1994. Etcheson was
alone, but was later joined by Hampton and Twila. A few hours
later, King, Etcheson, Hampton, and Twila went to another bar,
where they stayed until 3:30 a.m. 
 King drove the others home. When they arrived in front of
Twila's apartment building, King saw defendant yelling from a
third floor window before he approached the car. After Etcheson,
Hampton, and Twila got out, King drove away and circled the area. 
He returned to see defendant, Twila, Hampton, and Etcheson
arguing. Defendant hit Twila, knocking her to the ground, and
fought off Hampton, who was trying to keep him away from Twila. 
King sped away again, but parked on the side of the street, where 
Etcheson approached him asking for help. King got out of his car
and pulled out a knife while Etcheson grabbed a tire iron from
under the car seat.
 According to King, he changed his mind and decided to leave
because the altercation was none of his business. But, before he
left, he saw Etcheson approach defendant from behind and raise
the tire iron as he yelled out defendant's name. Defendant
turned around just as Etcheson swung the tire iron at him, caught
Etcheson's arm in midair, then punched him in the face. Etcheson
fell to his knees and onto the ground, immobile. King claimed
that he left the scene because he was afraid of defendant, who
was standing over Etcheson with the tire iron in his hand. King
testified that he did not see defendant strike Etcheson with the
tire iron, but admitted that he initially told the police that he
had seen defendant strike Etcheson with the tire iron. 
 A month later, King contacted the police after learning that
they were looking for him. King testified that both Chicago
Police Detective Victor Gutierrez, with whom he spoke on the
telephone, and the assistant State's Attorney to whom he spoke at
the police station knew that he had outstanding bond forfeiture
warrants on driving under the influence (DUI) charges. Gutierrez
told him that everything would be taken care of and the assistant
State's Attorney, without making any promises, said that possibly
something could be worked out. While at the police station, King
identified defendant from a lineup and gave a statement, which
was not recorded.
 Although no promises had been made, King left the police
station thinking that his outstanding warrants had been lifted,
but several days later, he was arrested and held in jail on the
warrants. After being contacted, Gutierrez refused to help King.
 On March 29, 1995, while in jail, King gave a written
statement to defendant's attorney stating that defendant did not
strike Etcheson with the tire iron. But, on April 6, 1995, King
wrote a letter to assistant State's Attorney Lu Ann Rodi, who was
the prosecutor in this case, offering to testify against
defendant if the State's Attorney's Office got him out of jail. 
At trial, King said that he was trying to do anything to get out
of jail. 
 A couple of weeks later, King met with Rodi, who served a
subpoena on him and told him that she wanted only his truthful
testimony. King told her he would not testify because he feared
for his safety in jail. He also said that he had been held for
40 days on a single DUI warrant, in which he had blown a .000 on
his breathalyzer test. He had offered to plead guilty in that
case, but had to have an alcohol evaluation before the plea would
be accepted. He missed his evaluation, however, because of his
meeting with Rodi. 
 Rodi told him that if this case were the only thing holding
him in jail, she would tell the prosecutors in his DUI case that
he had no bond set in this case. Rodi also said that she would
have his warrant case advanced so that he would be not be in
custody when this case came to trial. The following week, King's
warrant case was SOL'ed and he was released. 
 Prior to King's cross-examination, the defense attorney
objected to the trial court that he had not been given any notice
of the State's treatment of King. The trial court responded as
follows:
 "Nor did I. Basically, most of the testimony are things
 he imagined happened. I don't know. But his testimony
 is clear that he thinks things happen that don't
 happen."
Following those remarks, King was cross-examined. Following
King's testimony, the defense attorney attempted to admit
evidence of the document King's signed while in jail. The trial
court made the following statements:
 "[King] has pretty much admitted to all of
 the testimony [sic] prior testimony, prior
 inconsistencies, prior consistencies. So
 pretty much everything is in the record along
 with some of the things that make up the
 witness' ability to tell the truth, which is
 pretty clear.
 What I am saying is the witness you put up has the
 tendency, which is clear from his testimony, to take
 whichever position, even going into his testimony about
 the occurrence. He pretty much takes the position that
 is best for him at the particular point in time he's
 testifying. That's what I find from his testimony.
 * * *
 [I]t shows that he will turn on anyone.
 * * *
 What I find from the witness' complete
 testimony is his nature in protecting
 himself, including the fact that much of the
 testimony I heard about the tire iron would
 incriminate him. And yet the man has taken
 steps to insure a long distance away from
 that tire iron other than it being in his
 car."
 Next, defendant testified on his own behalf. He stated that
he fell asleep on the couch after Twila and Hampton had brought
him home from the bar. When he awoke shortly before 4 a.m., he
heard women's voices outside. Looking out the window, he saw a
drunken Twila stumbling out of a car. Angry, he yelled, "I'm
gonna kill you, you bitch" and ran downstairs. He pulled Twila
out of the car and a physical fight ensued between them. 
Defendant admitted hitting Twila in the face and fighting with
Hampton, who was trying to stop him from hitting Twila.
 According to defendant, Etcheson approached him and called
out his name. As he turned, he saw that Etcheson was going to
hit him with the tire iron, so he blocked the blow and punched
Etcheson in the eye, then threw the tire iron on the roof of a
nearby building. Immediately after the punch, Etcheson fell to
his knees, then backwards, striking his head on the street. 
Defendant stated that he did not intend to hurt Etcheson, but was
trying to defend himself. 
 After allowing the State to present its closing argument
with one minor interruption, the trial court interrupted the
defense attorney 45 times during his closing argument. Almost
immediately, the trial court interrupted the defense attorney's
argument, which was that it was almost impossible for defendant
to swing the tire iron while facing Etcheson and strike the back
of Etcheson's head. The trial court interrupted:
 "THE COURT: Let's address the practical impossibility. 
 Is that what the pathologist said in this case?
 [DEFENSE COUNSEL]: She didn't say it was impossible.
 THE COURT: That is your opinion. You're basing your
 argument then not on any evidence in this case; not on
 any reasonable inferences to be drawn from the
 evidence. It's just what you want me to believe as
 opposed to what the evidence showed in this case."
 The exchange between the trial court and the defense
attorney continued until the attorney changed the subject and
stated:
 "[DEFENSE COUNSEL]: Back to Norma Hampton. Norma
 admitted she had eight drinks."
 Again, the trial court interrupted, remarking:
 "THE COURT: Actually, the three people out there were
 drinking. The only one that didn't seem to be drunk
 was the witness that you called, Dennis King.
 [DEFENSE COUNSEL]: Dennis King, correct.
 THE COURT: He was out as long as everyone else was
 out. He is the one who had the warrants out for the
 drunk driving, and he is the one that -- everyone else
 was drunk except him. Everyone else did something
 except him." 
 Further in the defense's closing argument, the defense
attorney argues that it was unusual for an innocent defendant to
help the police in finding the murder weapon. The court
interrupted:
 "THE COURT: Why is that unusual? The argument --
 somewhere along the line, you're missing -- are you
 saying the police don't acquire evidence in cases from
 the defendants themselves?
 [DEFENSE COUNSEL]: No, I am not saying that.
 THE COURT: What is the argument? How unlogical it is
 for the defendant to turn over the murder weapon in
 this case?
 [DEFENSE COUNSEL]: Yes. Yes, I am saying that a
 guilty person does not call the police and say here's
 where it is, tells them where to find it. If he had
 hit --
 THE COURT: Would you say it's also logical for an
 innocent person to stick around for the police [sic]
 come and talk to them? And that is something that this
 innocent client that you say you represent didn't do,
 which represents what an innocent person might do.
 If that is your argument about the tire iron, why
 didn't he stick around for the police when they came if
 this innocent, self-defense person that injured
 somebody in the course of self-defense --"
 When the defense counsel remarked that there was no blood in
Etcheson's sinuses, the trial court interrupted:
 "It doesn't take a rocket scientist to know
 that if you are hit in the back of the head
 with an object such as used in this case
 which caused the damage that caused to the
 skull, that the blow alone could cause the
 movement which would cause blood in the
 sinuses.
 [DEFENSE COUNSEL]: Without a laceration and --
 THE COURT: Without all those things. It doesn't take
 a rocket scientist.
 [DEFENSE COUNSEL]: The medical examiner
 never testified that blood in the sinuses
 could be caused by a blow to the back of the
 head.
 THE COURT: You know, I don't think that is
 correct. Okay, I am just going on common
 sense and everyday experiences in life.
 [DEFENSE COUNSEL]: Common sense says you are going to
 be cut if someone hits you with a tire iron.
 THE COURT: The problem is that in all cases you're
 stuck with the facts that are presented. And you can
 say all those things and you can bring your dad in
 who's a doctor, which I think was a mistake on your
 part. But I just don't think we get any good evidence
 when we bring in someone who is so closely related to
 you to testify in a case where he has very limited
 experience. I allowed you to do it. I can't for a
 second imagine, think that you would rely or ask me to
 rely very heavily on that testimony when all it is is
 an opinion from your father, the doctor, based upon a
 case that you're handling.
 [DEFENSE COUNSEL]: Are you suggesting that he is
 lying?
 THE COURT: No, I am suggesting that he has no personal
 knowledge of what he testified to. That is what I
 [sic] suggesting.
 [DEFENSE COUNSEL]: No expert is going to have personal
 knowledge. 
 THE COURT: I am thinking that there is a reason for
 him to have this opinion.
 [DEFENSE COUNSEL]: I put him on --
 THE COURT: For whatever it was worth.
 [DEFENSE COUNSEL]: -- because he agreed to do it for
 free, just like I am doing.
 THE COURT: To me, I think it was a mistake."
 The court later continued his remarks about Dr. Geiger:
 THE COURT: On that particular point, your dad is going
 to have to bring in his 15. Because I don't think your
 dad has treated fifteen people with injuries from tire
 irons. I think the testimony was based upon you being
 the lawyer, and the escalation in the amount of tire
 iron cases he handled in his life.
 [DEFENSE COUNSEL]: He said between five and fifteen.
 THE COURT: And I think the fifteen is a little bit a
 coloration of the testimony because he is your dad. 
 And I think it was a mistake for you to call your dad
 as a witness in this case.
 [DEFENSE COUNSEL]: I didn't have any money to spend,
 zero. I received nothing. He received nothing.
 THE COURT: I don't know what that means. You think
 that is a plus?"
 When the defense counsel began his remarks about the
credibility of the witnesses, the trial court stated:
 "Well, you want to talk about Dennis King? Did you
 believe anything Dennis King said with all the
 inconsistencies, with all the motivation. 
 * * *
 It's so clear to everyone else in this room that the
 reason he changed his story is because the State didn't
 fulfill their obligation and didn't take care of the
 drunk driving, the 00. At the time he told them what
 happened, he was under the assumption that the State
 was going to do something for him. When they didn't,
 that little sneak decided to tell a different story.
 That little piece of garbage who came in here and swore
 under oath to a lot of things that weren't true,
 including the fact that the deceased in plain view got
 the tire iron from underneath the car, that is the
 biggest lie your witness told. That is so glaring and
 so totally wrong based upon the totality of the
 circumstances, it is the lead-in as to why anything
 that that individual says was so far from the truth,
 it's ridiculous."
 Following the closing arguments, the trial court found
defendant guilty of first-degree murder, and sentenced him to 55
years' imprisonment.
 Defendant's first assertion is that he was denied a fair
trial because the trial court was biased against him and his
witnesses. We will consider his arguments even though they were
not raised in his motion for a new trial. In furtherance of our
responsibility to provide a just result, this court can override
considerations of waiver. In re C.R.H., 163 Ill. 2d 263, 274,
644 N.E.2d 1153 (1994). Because of the fundamental importance of
a fair trial and the practical difficulties involved in objecting
to the trial court's conduct, application of the waiver rule is
less rigid if the basis for the objection is the trial court's
conduct in a bench trial. People v. Nevitt, 135 Ill. 2d 423,
455, 553 N.E.2d 368 (1990); People v. Davilla, 236 Ill. App. 3d
367, 380, 603 N.E.2d 666 (1992).
 After carefully considering the trial court's comments about
defense witnesses Dr. Geiger and King, particularly those prior
to King's cross-examination, and its comments during the defense
counsel's closing arguments, we conclude that the trial court was
prejudiced against defendant and his witnesses. 
 Although the trial court may comment on the credibility of
the witnesses at the close of the evidence (People v. Kennedy,
191 Ill. App. 3d 86, 91, 547 N.E.2d 634 (1989)), in this case,
the court improperly commented prior to the close of evidence. 
During Dr. Geiger's testimony, the trial court made sarcastic
comments about the doctor's testimony and questioned his
knowledge even though it had earlier stated that Dr. Geiger had
"a vast amount of training" when he was qualified him as an
expert witness. During closing argument, the court stated that
it was a mistake for the defense counsel to call his own father
as an expert. 
 In addition, the trial court made negative comments about
King even prior to his being cross-examined. The court expanded
those comments at the end of King's testimony. The trial court
also made excessive and exaggerated derogatory comments about
defendant during the defense's closing argument. 
 Moreover, the trial court did not allow the defense attorney
an adequate opportunity to present his closing argument. The
trial court's 40 to 50 interruptions and arguments with the
defense counsel during his closing argument indicated that the
trial court had already decided the case and was not interested
in any argument from the defense. In contrast, the trial court
made only one small comment during the State's entire closing
argument.
 In a criminal case, the trial must include an opportunity
for the defense counsel to argue the defendant's cause. People
v. Smith, 205 Ill. App. 3d 153, 156-57, 562 N.E.2d 553 (1990). 
It is not unheard of for the court to change its initial
impression following arguments by either the defense counsel or
prosecutor. Smith, 205 Ill. App. 3d at 157. Although the
closing argument is not evidence, the trial judge has a duty to
be attentive, patient, and impartial. Smith, 205 Ill. App. 3d at 
157. 
 Even though Smith, 205 Ill. App. 3d 153, is factually
dissimilar because the defense counsel was not allowed to argue
more than one sentence, the same principle is involved in both
cases. In Smith, the defendant's conviction was reversed because
the trial court mistakenly believed that it did not have to
listen to the closing argument. Similarly, in this case, the
trial court did not listen to the defense counsel's closing
argument. Even though the trial court allowed the defense
attorney to argue more than one sentence, it repeatedly
interrupted and argued with him. The attorney could not present
any argument fully before the trial court interrupted him,
challenging him at every turn. 
 It is our opinion that the trial court harbored preconceived
notions regarding defendant and his witnesses, which led it to
reject defendant's claim of self-defense even before defendant
presented all his evidence. After careful consideration of the
trial court's remarks in context, it is evident that the court
was evaluating the merit of the defense even before that defense
had been presented. People v. McDaniels, 144 Ill. App. 3d 459,
463, 494 N.E.2d 1275 (1986). The trial court's premature and
clearly biased remarks denied defendant a fair and impartial
trial. McDaniels, 144 Ill. App. 3d at 462. 
 "The right of a defendant to an unbiased, open-minded
 trier of fact is so fundamental to our system of
 jurisprudence that it should not require either
 citation or explanation. It is rooted in the
 constitutional guaranty of due process of law (See
 People v. Diaz (1971), 1 Ill. App. 3d 988, 992, 275
 N.E.2d 210, 212), and entitles a defendant to a fair
 and impartial trial before a court 'which proceeds not
 arbitrarily or capriciously, but upon inquiry, and
 renders judgment only after trial***.' (City of
 Chicago v. Cohn (1927), 326 Ill. 372, 374, 158 N.E.
 118, 120.) It is axiomatic that "[P]re-judgment is the
 antithesis of a fair trial." (People v. Diaz (1971), 1
 Ill. App. 3d 988, 992, 275 N.E.2d 210, 212.) These
 standards of impartiality apply to both judges and
 juries; one does not waive his right to an impartial
 trial by waiving his right to a jury. (People v. Diaz
 (1971), 1 Ill. App. 3d 988, 993, 275 N.E.2d 210, 213.) 
 If this most basic and fundamental right is not
 afforded a defendant during trial, that defendant has
 been denied due process of law and is entitled to a new
 trial. People v. Diaz (1971), 1 Ill. App. 3d 988, 993,
 275 N.E.2d 210, 213." McDaniels, 144 Ill. App. 3d at
 462. 
 Pursuant to People v. Taylor, 76 Ill. 2d 289, 391 N.E.2d
366 (1979), we are required to consider defendant's contention
that he was not proven guilty beyond a reasonable doubt. After
reviewing the record in the light most favorable to the
prosecution, we conclude that a rational trier of fact could have
found the essential elements of first-degree murder beyond a
reasonable doubt. People v. Rivera, 166 Ill. 2d 279, 287, 652
N.E.2d 307 (1995).
 Based on the foregoing, we reverse the circuit court's
judgment and remand this cause for a new trial.
 Reversed and remanded.
 GREIMAN, J., concurs.
 TULLY, P.J., dissents























 JUSTICE TULLY, dissenting:
 I must respectfully disagree with my colleagues' decision to
reverse defendant's conviction and remand the cause for a new
trial. I believe that the trial judge's comments were innocuous
at best and surely did not amount to reversible error. Moreover,
defendant was proven guilty of first-degree murder beyond a
reasonable doubt. Aside from my trouble with the majority's
reasoning in this case, I am particularly disturbed by the tone
of its opinion which comes close to being a personal attack on
the trial judge, an experienced circuit court judge with over a
decade of experience in the criminal division. Accordingly, I
would affirm the trial court's ruling for the reasons which
follow.
 Initially, I take issue with the majority's application of
the waiver rule to this case. Speaking to this question, the
supreme court of Illinois has repeatedly held that absent plain
error, "[b]oth a trial objection and a written post-trial motion
raising the issue are required for alleged errors that could have
been raised during trial." People v. Enoch, 122 Ill. 2d 176, 186
(1988); see also People v. Adams, 109 Ill. 2d 102, 116 (1985). 
In People v. Caballero, 102 Ill. 2d 23, 31 (1984), our supreme
court stated the reasons for the waiver rule as follows:
 "Failure to raise issues in the trial court
 denies that court the opportunity to grant a
 new trial, if warranted. This casts a
 needless burden of preparing and processing
 appeals upon appellate counsel for the
 defense, the prosecution, and upon the court
 of review. Without a post-trial motion
 limiting the consideration to errors
 considered significant, the appeal is open-
 ended. Appellate counsel may comb the record
 for every semblance of error and raise issues
 on appeal whether or not trial counsel
 considered them of any importance." 102 Ill.
 2d at 31-32.

This rule is both simple to understand and apply. In the case
sub judice, defendant did not include any of the alleged errors
in his post-trial motion and, as I shall explain infra, there was
no plain error. Thus, all of defendant's issues are waived and
therefore not cognizable on review. Enoch, 122 Ill. 2d at 176-
77.
 In order to evade the clear mandate of Caballero, Enoch and
their progeny the majority by necessity cites to cases which
soften the waiver doctrine in situations of alleged improper
judicial conduct in a bench trial. See People v. Nevitt, 135
Ill. 2d 423 (1990); People v. Davilla, 236 Ill. App. 3d 367
(1992). While I have no quarrel with the import of those cases;
they are simply inapplicable here. In order for a trial judge's
comments to constitute reversible error, a defendant must show
that the remarks were prejudicial and that he was harmed by them. 
People v. Westfield, 207 Ill. App. 3d 772, 778 (1990). In other
words, the defendant needs to establish that the comments were a
material factor in his conviction. People v. Garrett, 276 Ill.
App. 3d 702 (1995). Where is the proof of harm in this case? I
cannot find it. In addition, the majority completely omits any
discussion of the long line of cases which hold that where a
defendant receives a bench trial, not a jury trial, the danger of
prejudice due to judicial questioning decreases sharply. People
v. Griffin, 194 Ill. App. 3d 286, 296 (1990). 
 The majority's opinion painstakingly quotes various comments
made by the trial court out-of-context and then through the use
of its clairvoyant powers and judicial prestidigitation concludes
that the trial judge was biased against defendant and his
witnesses from almost the beginning of the trial. The truth of
the matter is that the trial judge merely commented on the
credibility of the witnesses based on their testimony, rather
that on any preconceived notions as the defense would have us
believe. A circuit court is free to examine witnesses in its
discretion, provided it does not become an advocate, thereby
abandoning its function as an impartial tribunal. People v.
White, 249 Ill. App. 3d 57, 61 (1993). The relevant inquiry in a
non-jury trial is whether the tenor of the court's questioning
indicates that the court has prejudged the verdict before hearing
all the evidence. People v. Griffin, 194 Ill. App. 3d at 296. 
The court may be justified in making such inquiries as a seeker
of the truth (White, 249 Ill. App. 3d at 61) or to clarify
material issues which seem obscure. People v. Wesley, 18 Ill. 2d
138 (1959).
 A careful review of the record reveals that the comments
made about Dennis King's testimony were not improper, since the
trial judge found his testimony incredible and further emphasized
that "[King] thinks things happen that don't happen." This, I
find, was an isolated comment, one that surely does not prejudice
defendant. After the cross-examination of this witness, it
became clear that Dennis King changed his story several times. 
The record demonstrates that King testified at trial that he
never saw defendant strike the victim with the tire iron. Yet,
upon cross-examination, he admitted that he told police that he
did see defendant strike the victim with the tire iron. 
Furthermore, the record shows that while King was in jail for
outstanding DUI warrants, King wrote a letter to an assistant's
State's Attorney stating that he would testify against defendant
if a deal could be worked out. Yet, he also met with defense
counsel while in jail and told him he would testify for
defendant. At trial, King admitted that he was trying to get out
of jail at any cost. It was then that the trial judge told
defense counsel that King can turn on anyone in order to protect
himself. Clearly, Mr. King was an individual who had some
problems getting his story straight and with the truth in
general. The judge's comments did not express a prejudgment of
the case. Rather, his comments were based on the evidence the
trial judge had before him. Thus, I cannot say that his
extensive comments on the credibility of King was reversible
error. 
 Additionally, the interruption and comments during closing
arguments were hardly detrimental to defendant's rights of having
a fair trial. The majority erroneously divined that the trial
judge was "not interested in any argument from the defense" since
he "had already decided on the case." That is simply not the
case. In this bench trial, the judge was attempting to get to
the truth and to clarify many of defense counsel's points. We
must remember that the test is whether the trial judge had become
an advocate and abandoned his function as an impartial tribunal. 
People v. Griffin, 194 Ill. App. 3d at 296. Here, the judge was
not an advocate. Expressing skepticism and becoming an advocate
are entirely different matters.
 Appellate defense claims that the trial judge interrupted
trial counsel's closing arguments over 40 times, yet does not
cite to the 40 so-called interruptions as error. Only a very few
are actually challenged by defendant. The majority bases its
decision in this matter on People v. Smith, 205 Ill. App. 3d 153
(1990), while noting that the case is factually dissimilar, in
other words, not on point. In Smith, the defendant's conviction
was reversed based on the trial court's improper conduct. Smith,
205 Ill. App. 3d at 157. The defense counsel did not get to
utter more than a sentence of her closing argument before the
trial judge cut her off, stating that he was not required to
listen to her arguments. Smith, 205 Ill. App. 3d at 156. Unlike
Smith, the trial court here did give defense counsel an ample
opportunity to argue.
 Moreover, I do not believe that the trial judge's comments
about defendant were derogatory when stating "less than human" or
"macho man." At one point during closing arguments, the trial
judge noted that defendant himself "admitted acting less than
human on this occasion when his wife was out drinking with
friends; acting less than what we would expect from a law-abiding
citizen[.]" This comment was based on defendant's own
admissions. It was defendant that testified to striking his wife
which caused her to fall to the ground, and yelling "I'm going to
kill you, you bitch." Comments based on the evidence and
defendant's own admission cannot be considered prejudicial.
 As to the questioning of Dr. Geiger, I do believe that the
comments made by the trial judge were prejudicial and
unwarranted. However, based on the overwhelming evidence in the
record proving defendant's guilt, I do not believe that those
comments, standing alone, constitute prejudicial error. 
 In sum, it has often been held that a criminal defendant is
entitled to a fair trial and not a perfect one. See, e.g.,
United States v. Hastings, 461 U.S. 499, 508-09, 103 S. Ct. 1974,
1980 (1983). In a bench trial, it is the function of the trial
court to determine the credibility of the witnesses, the weight
to be given their testimony and the inferences to be drawn from
the evidence. See People v. Westfield, 207 Ill. App. 3d at 778. 
I believe that defendant did not meet his burden in establishing
that the trial judge was biased. The trial court, despite
comment and questions, found defendant guilty based on the
evidence and testimony. The opinion of the majority needlessly
launches this case on another journey through the trial court,
which will come back again to the appellate court. This
additional caseload should not be imposed upon the judicial
system of this State where it is clear that the totality of the
trial judge's comments did not rise to the level of reversible
error. Accordingly, I would without hesitation affirm
defendant's conviction.