THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. NICHOLAS HEIMAN, Defendant-Appellant.

First District (4th Division)   No. 1—95—3549

Opinion filed December 26, 1996.

TULLY, P.J., dissenting.

Paul D. Geiger, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Kay Hanlon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:
Following a bench trial, defendant, Nicholas Heiman, was convicted of the first-degree murder (720 ILCS 5/9—1(a)(2) (West 1992)) of Erven Etcheson and was sentenced to 55 years' imprisonment. On appeal, he asserts that (1) he was not proven guilty beyond a reasonable doubt; (2) he did not receive a fair trial because of the trial court's bias toward him and his witnesses; (3) he was denied effective assistance of counsel because the trial court would not allow his attorney to present a proper closing argument; and (4) the trial court made findings of fact not supported by the evidence. We reverse and remand for a new trial because the trial court's conduct denied defendant a fair trial.

Norma Hampton, the victim's fiance, testified that she and Etcheson met defendant and his wife, Twila, at a neighborhood bar at 7 p.m. on July 9, 1994. After drinking and socializing for a couple

of hours, Hampton and Twila drove defendant home because he said he was drunk, then met Etcheson at another bar. When they arrived, Etcheson was talking to Dennis King, whom Hampton had never met. After that bar closed, King, Etcheson, and the two women went to another bar, where they stayed until 3:40 a.m.

King drove everyone home. When he arrived at Twila's apartment building, defendant was standing on the corner. Defendant dragged Twila from the car, then punched her a couple of times, causing her to fall to the ground. King grabbed a tire iron from under the car seat, got out of the car, and tried to hit defendant with the tire iron, but defendant grabbed it from him, then chased him back to his car.

After King sped away, defendant returned to the location where Hampton and Etcheson were attending to Twila. Etcheson remarked, "Nick, don't you think that's enough," and defendant struck him with the tire iron using a round, sweeping, sidearm action. The two men were facing each other and the blow landed at the rear base of Etcheson's skull, causing him to fall.

Hampton ran to call 911. When she returned, defendant was cussing at her from across the street and Twila was holding Etcheson's head. Etcheson was unconscious and having convulsions. The next night, defendant left a message on Hampton's answering machine, "Bitch, you're dead, bitch."

Dr. Cynthia Porterfield, the Cook County deputy medical examiner who performed the autopsy on Etcheson, testified that the only external injury was an abrasion on the back of the right side of his head. There was no skull fracture, but there was bleeding between the scalp and the skull on the back of his head. On the right side of his brain was a small subdural hematoma, which is bleeding between the membranes surrounding the brain. There was also swelling of the brain and blood in the brain's ventricles. It was Dr. Porterfield's opinion that death resulted from cerebral injuries caused by blunt trauma to the head and Etcheson's wounds were consistent with his being struck with a tire iron.

Chicago police detective John Boyle was assigned on July 11, 1994, to investigate an aggravated battery on Etcheson. He testified that he interviewed Hampton and Twila, but could not find defendant. Five days after Etcheson died, defendant called Boyle and admitted being involved in the incident. He told Boyle that he did not intend to kill Etcheson, who was a friend, and had thrown the tire iron on the roof of the building across the street from the incident.

Defendant tendered Dr. Paul W. Geiger, a general practitioner

and the father of defendant's attorney, as an expert in the field of emergency medical care, which Dr. Geiger practiced intermittently during his 29 years as a physician. Although the trial court expressed reservations about Dr. Geiger's relationship to the defense attorney, he was nevertheless qualified as an emergency medical care expert. The court stated as follows:

"I certainly find a vast amount of training here. I am more bothered by the relationship which shows an interest or bias.

I am going to let him testify with the thought in mind that my wife, my son, or my father could not practice in this courtroom, nor do I think it is a proper thing to—you know, especially if you are not even going to pay your dad, to have him come in and testify. It certainly does show to me at least an indication that it might be a little more favorable to the son's position. But I will allow you to ask questions of your father as an expert in emergency care."

The defense attorney then attempted to question Dr. Geiger about any remuneration the defense attorney was receiving for his services. The assistant State's Attorney objected on the basis of relevancy and the defense counsel countered that it went to the witness' credibility. The court sustained the objection and stated:

"I don't think it goes to his credibility. What you have been paid I don't think goes to your dad's credibility."

Dr. Geiger's testimony was based on his review of the hospital records and autopsy findings, which indicated that the only external injury was the abrasion at the back of Etcheson's head. Dr. Geiger estimated that he had treated 5 to 15 persons who had been hit by a tire iron. The trauma flow sheet indicated that Etcheson had a three-inch hematoma at the back of his head but did not mention any laceration or skull fracture. Dr. Geiger explained that the hematoma could not be seen but could be felt under the skin. Dr. Geiger testified that every person he had ever treated for a tire iron injury to the head had scalp lacerations that required stitches. The following then occurred:

"[DEFENSE ATTORNEY]: Within a reasonable degree of medical certainty, if you and I are facing each other and I swing this at you, can I inflict that abrasion wound on you?

[ASSISTANT STATE'S ATTORNEY]: Objection. He is not an expert in the field of forensic pathology. He is going way far afield.

[DEFENSE ATTORNEY]: This is not a question regarding forensic pathology.

THE COURT: I want to hear the answer. I want to hear what he bases the answer on. I want to hear how counsel can make the statement that—so far it's clear to me that no one knows how the

tire iron, other than it was a roundhouse swinging, where the tire iron landed; what part of the tire iron landed on the head, if in fact it did; if it was a glancing blow; if it was thrown; if it hit in one place and that touched the skull first, and then another portion, as could happen if it was in a twisting fashion.

There are so many possibilities that I am really dying to hear how this expert can render this opinion."

Dr. Geiger then stated that it was his opinion that someone facing Etcheson could not have caused the abrasion, which was larger than the surface of the tire iron, by striking him in the back of the head with the tire iron. When asked whether the blow had to be a glancing blow that dragged across the surface of the skin, Dr. Geiger testified that he could not imagine that happening. The trial court interrupted the questioning to remark:

"THE COURT: Well, why don't you just take the tire iron, swing it, and have it hit the table in front of you, and see all the different ways it can bounce off the wood, and how many marks are going to be made on it; if that is what your [sic] basing your opinion on, gee whiz."

[DR. GEIGER]: I am sorry. I don't understand.

THE COURT: Nor do I understand your testimony here."

Dr. Geiger then stated that the abrasion was consistent with a fall on a flat object and Etcheson's CT scan showed blood in his sinuses, which would have been caused by a blow to his face. Dr. Geiger thought it would be extremely unusual for a blow to the back of the head to cause bleeding in the sinuses because the sinuses are separated from the brain by a quarter-inch-thick bone.

Dennis King, an eyewitness, testified that he met Etcheson at a bar around 8:30 or 9 p.m. on July 8, 1994. Etcheson was alone, but was later joined by Hampton and Twila. A few hours later, King, Etcheson, Hampton, and Twila went to another bar, where they stayed until 3:30 a.m.

King drove the others home. When they arrived in front of Twila's apartment building, King saw defendant yelling from a third-floor window before he approached the car. After Etcheson, Hampton, and Twila got out, King drove away and circled the area. He returned to see defendant, Twila, Hampton, and Etcheson arguing. Defendant hit Twila, knocking her to the ground, and fought off Hampton, who was trying to keep him away from Twila. King sped away again, but parked on the side of the street, where Etcheson approached him asking for help. King got out of his car and pulled out a knife while Etcheson grabbed a tire iron from under the car seat.

According to King, he changed his mind and decided to leave because the altercation was none of his business. But, before he left,

he saw Etcheson approach defendant from behind and raise the tire iron as he yelled out defendant's name. Defendant turned around just as Etcheson swung the tire iron at him, caught Etcheson's arm in midair, then punched him in the face. Etcheson fell to his knees and onto the ground, immobile. King claimed that he left the scene because he was afraid of defendant, who was standing over Etcheson with the tire iron in his hand. King testified that he did not see defendant strike Etcheson with the tire iron, but admitted that he initially told the police that he had seen defendant strike Etcheson with the tire iron.

A month later, King contacted the police after learning that they were looking for him. King testified that both Chicago police detective Victor Gutierrez, with whom he spoke on the telephone, and the assistant State's Attorney to whom he spoke at the police station knew that he had outstanding bond forfeiture warrants on driving under the influence (DUI) charges. Gutierrez told him that everything would be taken care of and the assistant State's Attorney, without making any promises, said that possibly something could be worked out. While at the police station, King identified defendant from a lineup and gave a statement, which was not recorded.

Although no promises had been made, King left the police station thinking that his outstanding warrants had been lifted, but several days later, he was arrested and held in jail on the warrants. After being contacted, Gutierrez refused to help King.

On March 29, 1995, while in jail, King gave a written statement to defendant's attorney stating that defendant did not strike Etcheson with the tire iron. But, on April 6, 1995, King wrote a letter to Assistant State's Attorney Lu Ann Rodi, who was the prosecutor in this case, offering to testify against defendant if the State's Attorney's office got him out of jail. At trial, King said that he was trying to do anything to get out of jail.

A couple of weeks later, King met with Rodi, who served a subpoena on him and told him that she wanted only his truthful testimony. King told her he would not testify because he feared for his safety in jail. He also said that he had been held for 40 days on a single DUI warrant, in which he had blown a .000 on his breathalyzer test. He had offered to plead guilty in that case but had to have an alcohol evaluation before the plea would be accepted. He missed his evaluation, however, because of his meeting with Rodi.

Rodi told him that if this case were the only thing holding him in jail, she would tell the prosecutors in his DUI case that he had no bond set in this case. Rodi also said that she would have his warrant case advanced so that he would be not be in custody when this case

came to trial. The following week, King's warrant case was SOL'ed and he was released.

Prior to King's cross-examination, the defense attorney objected to the trial court that he had not been given any notice of the State's treatment of King. The trial court responded as follows:

"Nor did I. Basically, most of the testimony are things he imagined happened. I don't know. But his testimony is clear that he thinks things happen that don't happen."

Following those remarks, King was cross-examined. Following King's testimony, the defense attorney attempted to admit evidence of the document King signed while in jail. The trial court made the following statements:

"[King] has pretty much admitted to all of the testimony [sic] prior testimony, prior inconsistencies, prior consistencies. So pretty much everything is in the record along with some of the things that make up the witness' ability to tell the truth, which is pretty clear.

What I am saying is the witness you put up has the tendency, which is clear from his testimony, to take whichever position, even going into his testimony about the occurrence. He pretty much takes the position that is best for him at the particular point in time he's testifying. That's what I find from his testimony.

\* \* \*

\*\*\* [I]t shows that he will turn on anyone.

\* \* \*

What I find from the witness' complete testimony is his nature in protecting himself, including the fact that much of the testimony I heard about the tire iron would incriminate him. And yet the man has taken steps to insure a long distance away from that tire iron other than it being in his car."

Next, defendant testified on his own behalf. He stated that he fell asleep on the couch after Twila and Hampton had brought him home from the bar. When he awoke shortly before 4 a.m., he heard women's voices outside. Looking out the window, he saw a drunken Twila stumbling out of a car. Angry, he yelled, "I'm gonna kill you, you bitch" and ran downstairs. He pulled Twila out of the car and a physical fight ensued between them. Defendant admitted hitting Twila in the face and fighting with Hampton, who was trying to stop him from hitting Twila.

According to defendant, Etcheson approached him and called out his name. As he turned, he saw that Etcheson was going to hit him with the tire iron, so he blocked the blow and punched Etcheson in the eye, then threw the tire iron on the roof of a nearby building. Immediately after the punch, Etcheson fell to his knees, then backwards,

striking his head on the street. Defendant stated that he did not intend to hurt Etcheson but was trying to defend himself.

After allowing the State to present its closing argument with one minor interruption, the trial court interrupted the defense attorney 45 times during his closing argument. Almost immediately, the trial court interrupted the defense attorney's argument, which was that it was almost impossible for defendant to swing the tire iron while facing Etcheson and strike the back of Etcheson's head. The trial court interrupted:

"THE COURT: Let's address the practical impossibility. Is that what the pathologist said in this case?

[DEFENSE COUNSEL]: She didn't say it was impossible.

THE COURT: That is your opinion. You're basing your argument then not on any evidence in this case; not on any reasonable inferences to be drawn from the evidence. It's just what you want me to believe as opposed to what the evidence showed in this case."

The exchange between the trial court and the defense attorney continued until the attorney changed the subject and stated:

"[DEFENSE COUNSEL]: Back to Norma Hampton. Norma admitted she had eight drinks."

Again, the trial court interrupted, remarking:

"THE COURT: Actually, the three people out there were drinking. The only one that didn't seem to be drunk was the witness that you called, Dennis King.

[DEFENSE COUNSEL]: Dennis King, correct.

THE COURT: He was out as long as everyone else was out. He is the one who had the warrants out for the drunk driving, and he is the one that—everyone else was drunk except him. Everyone else did something except him."

Further, in the defense's closing argument, the defense attorney argued that it was unusual for an innocent defendant to help the police in finding the murder weapon. The court interrupted:

"THE COURT: Why is that unusual? The argument— somewhere along the line, you're missing—are you saying the police don't acquire evidence in cases from the defendants themselves?

[DEFENSE COUNSEL]: No, I am not saying that.

THE COURT: What is the argument? How unlogical it is for the defendant to turn over the murder weapon in this case?

[DEFENSE COUNSEL]: Yes. Yes, I am saying that a guilty person does not call the police and say here's where it is, tells them where to find it. If he had hit—

THE COURT: Would you say it's also logical for an innocent person to stick around for the police [sic] come and talk to them?

And that is something that this innocent client that you say you represent didn't do, which represents what an innocent person might do.

If that is your argument about the tire iron, why didn't he stick around for the police when they came if this innocent, self-defense person that injured somebody in the course of self-defense—."

When the defense counsel remarked that there was no blood in Etcheson's sinuses, the trial court interrupted:

"It doesn't take a rocket scientist to know that if you are hit in the back of the head with an object such as used in this case which caused the damage that caused to the skull, that the blow alone could cause the movement which would cause blood in the sinuses.

[DEFENSE COUNSEL]: Without a laceration and—

THE COURT: Without all those things. It doesn't take a rocket scientist.

[DEFENSE COUNSEL]: The medical examiner never testified that blood in the sinuses could be caused by a blow to the back of the head.

THE COURT: You know, I don't think that is correct. Okay, I am just going on common sense and everyday experiences in life.

[DEFENSE COUNSEL]: Common sense says you are going to be cut if someone hits you with a tire iron.

THE COURT: The problem is that in all cases you're stuck with the facts that are presented. And you can say all those things and you can bring your dad in who's a doctor, which I think was a mistake on your part. But I just don't think we get any good evidence when we bring in someone who is so closely related to you to testify in a case where he has very limited experience. I allowed you to do it. I can't for a second imagine, think that you would rely or ask me to rely very heavily on that testimony when all it is is an opinion from your father, the doctor, based upon a case that you're handling.

[DEFENSE COUNSEL]: Are you suggesting that he is lying?

THE COURT: No, I am suggesting that he has no personal knowledge of what he testified to. That is what I [sic] suggesting.

[DEFENSE COUNSEL]: No expert is going to have personal knowledge.

THE COURT: I am thinking that there is a reason for him to have this opinion.

[DEFENSE COUNSEL]: I put him on—

THE COURT: For whatever it was worth.

[DEFENSE COUNSEL]: —because he agreed to do it for free, just like I am doing.

THE COURT: To me, I think it was a mistake."

The court later continued his remarks about Dr. Geiger:

THE COURT: On that particular point, your dad is going to have to bring in his 15. Because I don't think your dad has treated fifteen people with injuries from tire irons. I think the testimony was based upon you being the lawyer, and the escalation in the amount of tire iron cases he handled in his life.

[DEFENSE COUNSEL]: He said between five and fifteen.

THE COURT: And I think the fifteen is a little bit a coloration of the testimony because he is your dad. And I think it was a mistake for you to call your dad as a witness in this case.

[DEFENSE COUNSEL]: I didn't have any money to spend, zero. I received nothing. He received nothing.

THE COURT: I don't know what that means. You think that is a plus?"

When the defense counsel began his remarks about the credibility of the witnesses, the trial court stated:

"Well, you want to talk about Dennis King? Did you believe anything Dennis King said with all the inconsistencies, with all the motivation.

* * *

It's so clear to everyone else in this room that the reason he changed his story is because the State didn't fulfill their obligation and didn't take care of the drunk driving, the 00. At the time he told them what happened, he was under the assumption that the State was going to do something for him. When they didn't, that little sneak decided to tell a different story. That little piece of garbage who came in here and swore under oath to a lot of things that weren't true, including the fact that the deceased in plain view got the tire iron from underneath the car, that is the biggest lie your witness told. That is so glaring and so totally wrong based upon the totality of the circumstances, it is the lead-in as to why anything that that individual says was so far from the truth, it's ridiculous."

Following the closing arguments, the trial court found defendant guilty of first-degree murder and sentenced him to 55 years' imprisonment.

■ Defendant's first assertion is that he was denied a fair trial because the trial court was biased against him and his witnesses. We will consider his arguments even though they were not raised in his motion for a new trial. In furtherance of our responsibility to provide a just result, this court can override considerations of waiver. *In re C.R.H.*, 163 Ill. 2d 263, 274, 644 N.E.2d 1153 (1994). Because of the fundamental importance of a fair trial and the practical difficulties involved in objecting to the trial court's conduct, application of the waiver rule is less rigid if the basis for the objection is the trial court's conduct in a bench trial. *People v. Nevitt*, 135 Ill. 2d 423, 455,

553 N.E.2d 368 (1990); *People v. Davilla*, 236 Ill. App. 3d 367, 380, 603 N.E.2d 666 (1992).

After carefully considering the trial court's comments about defense witnesses Dr. Geiger and King, particularly those prior to King's cross-examination, and its comments during the defense counsel's closing arguments, we conclude that the trial court was prejudiced against defendant and his witnesses.

■ Although the trial court may comment on the credibility of the witnesses at the close of the evidence (*People v. Kennedy*, 191 Ill. App. 3d 86, 91, 547 N.E.2d 634 (1989)), in this case, the court improperly commented prior to the close of evidence. During Dr. Geiger's testimony, the trial court made sarcastic comments about the doctor's testimony and questioned his knowledge even though it had earlier stated that Dr. Geiger had "a vast amount of training" when he qualified him as an expert witness. During closing argument, the court stated that it was a mistake for the defense counsel to call his own father as an expert.

In addition, the trial court made negative comments about King even prior to his being cross-examined. The court expanded those comments at the end of King's testimony. The trial court also made excessive and exaggerated derogatory comments about defendant during the defense's closing argument.

Moreover, the trial court did not allow the defense attorney an adequate opportunity to present his closing argument. The trial court's 40 to 50 interruptions and arguments with the defense counsel during his closing argument indicated that the trial court had already decided the case and was not interested in any argument from the defense. In contrast, the trial court made only one small comment during the State's entire closing argument.

■ In a criminal case, the trial must include an opportunity for the defense counsel to argue the defendant's cause. *People v. Smith*, 205 Ill. App. 3d 153, 156-57, 562 N.E.2d 553 (1990). It is not unheard of for the court to change its initial impression following arguments by either the defense counsel or prosecutor. *Smith*, 205 Ill. App. 3d at 157. Although the closing argument is not evidence, the trial judge has a duty to be attentive, patient, and impartial. *Smith*, 205 Ill. App. 3d at 157.

■ Even though *Smith*, 205 Ill. App. 3d 153, 562 N.E.2d 553, is factually dissimilar because the defense counsel was not allowed to argue more than one sentence, the same principle is involved in both cases. In *Smith*, the defendant's conviction was reversed because the trial court mistakenly believed that it did not have to listen to the closing argument. Similarly, in this case, the trial court did not listen

to the defense counsel's closing argument. Even though the trial court allowed the defense attorney to argue more than one sentence, it repeatedly interrupted and argued with him. The attorney could not present any argument fully before the trial court interrupted him, challenging him at every turn.

It is our opinion that the trial court harbored preconceived notions regarding defendant and his witnesses, which led it to reject defendant's claim of self-defense even before defendant presented all his evidence. After careful consideration of the trial court's remarks in context, it is evident that the court was evaluating the merit of the defense even before that defense had been presented. *People v. McDaniels*, 144 Ill. App. 3d 459, 463, 494 N.E.2d 1275 (1986). The trial court's premature and clearly biased remarks denied defendant a fair and impartial trial. *McDaniels*, 144 Ill. App. 3d at 462.

"The right of a defendant to an unbiased, open-minded trier of fact is so fundamental to our system of jurisprudence that it should not require either citation or explanation. It is rooted in the constitutional guaranty of due process of law (see *People v. Diaz* (1971), 1 Ill. App. 3d 988, 992, 275 N.E.2d 210, 212), and entitles a defendant to a fair and impartial trial before a court 'which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial' (*City of Chicago v. Cohn* (1927), 326 Ill. 372, 374, 158 N.E. 118, 120). It is axiomatic that '[p]re-judgment is the antithesis of a fair trial.' (*People v. Diaz* (1971), 1 Ill. App. 3d 988, 992, 275 N.E.2d 210, 212.) These standards of impartiality apply to both judges and juries; one does not waive his right to an impartial trial by waiving his right to a jury. (*People v. Diaz* (1971), 1 Ill. App. 3d 988, 993, 275 N.E.2d 210, 213.) If this most basic and fundamental right is not afforded a defendant during trial, that defendant has been denied due process of law and is entitled to a new trial. *People v. Diaz* (1971), 1 Ill. App. 3d 988, 993, 275 N.E.2d 210, 213." *McDaniels*, 144 Ill. App. 3d at 462.

Pursuant to *People v. Taylor*, 76 Ill. 2d 289, 391 N.E.2d 366 (1979), we are required to consider defendant's contention that he was not proven guilty beyond a reasonable doubt. After reviewing the record in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of first-degree murder beyond a reasonable doubt. *People v. Rivera*, 166 Ill. 2d 279, 287, 652 N.E.2d 307 (1995).

Based on the foregoing, we reverse the circuit court's judgment and remand this cause for a new trial.

Reversed and remanded.

GREIMAN, J., concurs.

JUSTICE TULLY, dissenting:

I must respectfully disagree with my colleagues' decision to reverse defendant's conviction and remand the cause for a new trial. I believe that the trial judge's comments were innocuous at best and surely did not amount to reversible error. Moreover, defendant was proven guilty of first-degree murder beyond a reasonable doubt. Aside from my trouble with the majority's reasoning in this case, I am particularly disturbed by the tone of its opinion, which comes close to being a personal attack on the trial judge, an experienced circuit court judge with over a decade of experience in the criminal division. Accordingly, I would affirm the trial court's ruling for the reasons that follow.

Initially, I take issue with the majority's application of the waiver rule to this case. Speaking to this question, the supreme court of Illinois has repeatedly held that, absent plain error, "*[b]oth* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); see also *People v. Adams*, 109 Ill. 2d 102, 116 (1985). In *People v. Caballero*, 102 Ill. 2d 23, 31 (1984), our supreme court stated the reasons for the waiver rule as follows:

"Failure to raise issues in the trial court denies that court the opportunity to grant a new trial, if warranted. This casts a needless burden of preparing and processing appeals upon appellate counsel for the defense, the prosecution, and upon the court of review. Without a post-trial motion limiting the consideration to errors considered significant, the appeal is open-ended. Appellate counsel may comb the record for every semblance of error and raise issues on appeal whether or not trial counsel considered them of any importance." 102 Ill. 2d at 31-32.

This rule is both simple to understand and apply. In the case *sub judice*, defendant did not include any of the alleged errors in his post-trial motion and, as I shall explain *infra*, there was no plain error. Thus, all of defendant's issues are waived and therefore not cognizable on review. *Enoch*, 122 Ill. 2d at 176-77.

In order to evade the clear mandate of *Caballero*, *Enoch* and their progeny, the majority by necessity cites to cases that soften the

waiver doctrine in situations of alleged improper judicial conduct in a bench trial. See *People v. Nevitt*, 135 Ill. 2d 423 (1990); *People v. Davilla*, 236 Ill. App. 3d 367 (1992). While I have no quarrel with the import of those cases, they are simply inapplicable here. In order for a trial judge's comments to constitute reversible error, a defendant must show that the remarks were prejudicial and that he was harmed by them. *People v. Westfield*, 207 Ill. App. 3d 772, 778 (1990). In other words, the defendant needs to establish that the comments were a material factor in his conviction. *People v. Garrett*, 276 Ill. App. 3d 702 (1995). Where is the proof of harm in this case? I cannot find it. In addition, the majority completely omits any discussion of the long line of cases that holds that where a defendant receives a bench trial, not a jury trial, the danger of prejudice due to judicial questioning decreases sharply. *People v. Griffin*, 194 Ill. App. 3d 286, 296 (1990).

The majority's opinion painstakingly quotes various comments made by the trial court out of context and then through the use of its clairvoyant powers and judicial prestidigitation concludes that the trial judge was biased against defendant and his witnesses from almost the beginning of the trial. The truth of the matter is that the trial judge merely commented on the credibility of the witnesses based on their testimony, rather that on any preconceived notions as the defense would have us believe. A circuit court is free to examine witnesses in its discretion, provided it does not become an advocate, thereby abandoning its function as an impartial tribunal. *People v. White*, 249 Ill. App. 3d 57, 61 (1993). The relevant inquiry in a non-jury trial is whether the tenor of the court's questioning indicates that the court has prejudged the verdict before hearing all the evidence. *People v. Griffin*, 194 Ill. App. 3d at 296. The court may be justified in making such inquiries as a seeker of the truth (*White*, 249 Ill. App. 3d at 61) or to clarify material issues which seem obscure. *People v. Wesley*, 18 Ill. 2d 138 (1959).

A careful review of the record reveals that the comments made about Dennis King's testimony were not improper, since the trial judge found his testimony incredible and further emphasized that "[King] thinks things happen that don't happen." This, I find, was an isolated comment, one that surely does not prejudice defendant. After the cross-examination of this witness, it became clear that Dennis King changed his story several times. The record demonstrates that King testified at trial that he never saw defendant strike the victim with the tire iron. Yet, upon cross-examination, he admitted that he told police that he did see defendant strike the victim with the tire iron. Furthermore, the record shows that while King was in jail for outstanding DUI warrants, King wrote a letter to an assistant's

State's Attorney stating that he would testify against defendant if a deal could be worked out. Yet, he also met with defense counsel while in jail and told him he would testify for defendant. At trial, King admitted that he was trying to get out of jail at any cost. It was then that the trial judge told defense counsel that King can turn on anyone in order to protect himself. Clearly, Mr. King was an individual who had some problems getting his story straight and with the truth in general. The judge's comments did not express a prejudgment of the case. Rather, his comments were based on the evidence the trial judge had before him. Thus, I cannot say that his extensive comments on the credibility of King was reversible error.

Additionally, the interruption and comments during closing arguments were hardly detrimental to defendant's rights of having a fair trial. The majority erroneously divined that the trial judge was "not interested in any argument from the defense" since he "had already decided on the case." 286 Ill. App. 3d at 112. That is simply not the case. In this bench trial, the judge was attempting to get to the truth and to clarify many of defense counsel's points. We must remember that the test is whether the trial judge had become an advocate and abandoned his function as an impartial tribunal. *People v. Griffin*, 194 Ill. App. 3d at 296. Here, the judge was not an advocate. Expressing skepticism and becoming an advocate are entirely different matters.

Appellate defense counsel claims that the trial judge interrupted trial counsel's closing arguments over 40 times, yet does not cite to the 40 so-called interruptions as error. Only a very few are actually challenged by defendant. The majority bases its decision in this matter on *People v. Smith*, 205 Ill. App. 3d 153 (1990), while noting that the case is factually dissimilar, in other words, not on point. In *Smith*, the defendant's conviction was reversed based on the trial court's improper conduct. *Smith*, 205 Ill. App. 3d at 157. The defense counsel did not get to utter more than a sentence of her closing argument before the trial judge cut her off, stating that he was not required to listen to her arguments. *Smith*, 205 Ill. App. 3d at 156. Unlike *Smith*, the trial court here did give defense counsel an ample opportunity to argue.

Moreover, I do not believe that the trial judge's comments about defendant were derogatory when stating "less than human" or "macho man." At one point during closing arguments, the trial judge noted that defendant himself "admitted acting less than human on this occasion when his wife was out drinking with friends; acting less than what we would expect from a law-abiding citizen." This comment was based on defendant's own admissions. It was defendant

that testified to striking his wife, which caused her to fall to the ground, and yelling "I'm going to kill you, you bitch." Comments based on the evidence and defendant's own admission cannot be considered prejudicial.

As to the questioning of Dr. Geiger, I do believe that the comments made by the trial judge were prejudicial and unwarranted. However, based on the overwhelming evidence in the record proving defendant's guilt, I do not believe that those comments, standing alone, constitute prejudicial error.

In sum, it has often been held that a criminal defendant is entitled to a fair trial and not a perfect one. See, *e.g.*, *United States v. Hasting*, 461 U.S. 499, 508-09, 76 L. Ed. 2d 96, 105-06, 103 S. Ct. 1974, 1980 (1983). In a bench trial, it is the function of the trial court to determine the credibility of the witnesses, the weight to be given their testimony and the inferences to be drawn from the evidence. See *People v. Westfield*, 207 Ill. App. 3d at 778. I believe that defendant did not meet his burden in establishing that the trial judge was biased. The trial court, despite comment and questions, found defendant guilty based on the evidence and testimony. The opinion of the majority needlessly launches this case on another journey through the trial court, which will come back again to the appellate court. This additional caseload should not be imposed upon the judicial system of this state where it is clear that the totality of the trial judge's comments did not rise to the level of reversible error. Accordingly, I would without hesitation affirm defendant's conviction.