2025 IL App (1st) 232094-U

No. 1-23-2094

Order filed January 14, 2025

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 3638 |
| | ) | |
| NICOLE BROWN, | ) | Honorable |
| | ) | Joseph M. Cataldo, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1     *Held*: We reverse defendant's conviction for aggravated battery because the trial court violated her right to due process by conducting *ex parte* testing of a revolver and by speculating as to what injuries and recoil an accidental discharge of the revolver might have caused without expert testimony to support such speculation. We remand this matter for a new trial.

¶ 2     Following a bench trial, the trial court found defendant Nicole Brown guilty of one count of aggravated battery and not guilty of two counts of attempt first-degree murder. The court sentenced defendant to nine years in prison. On appeal, defendant argues that, in finding her guilty,

the trial court improperly relied on its own *ex parte* testing of the revolver at issue, as well as speculation about what injuries and recoil an accidental discharge of the revolver might have caused. For the following reasons, we reverse and remand for a new trial.

¶ 3                                                     I. BACKGROUND

¶ 4       The State proceeded to a bench trial on two counts of attempt first-degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2022)) and one count of aggravated battery premised on defendant knowingly discharging a firearm and injuring Sean Spencer (*id.* §12-3.05(e)(1)).

¶ 5       Spencer testified that he and defendant had been dating for approximately two years as of February 2023. During the early morning hours of February 25, 2023, Spencer left work, drove to defendant's home in Schaumburg, and spent the night with her. Spencer and defendant awoke at approximately 1:30 p.m. and began arguing. Defendant told Spencer to leave. Spencer went to the bathroom while defendant "rant[ed]" and swore at him. He heard her "rumbling" in a closet near the bathroom. Defendant opened the bathroom door and brandished a "reddish-pink" revolver in her left hand. Spencer saw that the revolver was loaded and told defendant to put it away.

¶ 6       Spencer retrieved his belongings from the bedroom, went downstairs, and started to leave through the garage. He stopped near the open garage door to search for his cigarette lighter when defendant entered the garage and again told him to leave. Defendant was waving the revolver with her left hand. Spencer bent down to pick up his bag, and when he stood up, he saw defendant pointing the revolver at him from approximately six feet away with her left arm outstretched. Spencer saw a flash and smoke, heard a bang, felt a burning sensation on his neck, and realized defendant had shot him. Spencer grabbed his neck and tried to say, "[Y]ou shot me," but he had "lost [his] voice." Defendant ran back into the house holding the revolver and closed the door to

the garage behind her. Spencer tried to reenter the house through that door, but it was locked. He also tried to yell for help but could not speak. In court, Spencer identified defendant's revolver, which the State moved into evidence.

¶ 7    Spencer walked through the open garage door, crossed the street, and approached a group of neighbors outside. He was bleeding from his mouth and both sides of his neck. The neighbors called 911 and tried to slow the bleeding with paper towels while Spencer sat in a driveway. Paramedics and police arrived shortly thereafter and transported Spencer to the hospital.

¶ 8    Spencer was in a coma for approximately three weeks and remained in the hospital for a week after that. He had to relearn to walk and now walks with a limp. Spencer identified a scar in the middle of his throat and two scars on the left side of his neck. A bullet fragment remains in his spine. Defendant shot him one time, but he acknowledged telling a detective that he thought he had been shot multiple times because the bullet fragmented and caused multiple wounds to his neck. Spencer denied that he handled defendant's revolver.

¶ 9    The parties stipulated that Spencer was admitted to Lutheran General Hospital on February 25, 2023, and was discharged on March 23, 2023. The State moved his medical records and photographs of him in the hospital into evidence.

¶ 10    The parties also stipulated that defendant called 911 at approximately 3 p.m. on February 25, 2023, and that her call was recorded. The recording is included in the record on appeal. Defendant initially told the 911 call taker, "I don't know if it's an emergency or not, but I'm kind of in shock right now." She said her "ex" cocked her gun, which "went off in the garage" because she did not know how to uncock the gun. When the call taker asked if Spencer "accidentally shot himself," defendant responded, "Yes." Defendant also said she was inside her house and could see

her "ex" outside across the street, sitting up and breathing with neighbors helping him. She initially told the call taker that her "ex" had been shot, but later said she did not think he had been shot.

¶ 11    George Wickster testified that he lived on the same block as defendant. At approximately 3 p.m. on February 25, 2023, Wickster heard what he thought was a tire popping and went outside to investigate. A neighbor who spoke limited English approached and asked Wickster to call 911, which he did. Wickster and the neighbor then walked to a nearby apartment building and saw Spencer lying on the ground struggling to breathe. Spencer said, "[P]lease send the paramedics, I've been shot." Police and paramedics arrived shortly thereafter. Wickster also saw a woman across the street talking on the phone.

¶ 12    Schaumburg paramedic David Steele testified that he responded to a report of a person shot at approximately 3 p.m. on February 25, 2023. He saw Spencer in a driveway holding a bloody towel to his neck. Steele observed two puncture wounds to the left side of Spencer's neck and one puncture wound to the right side of his neck. Steele treated the neck wounds in an ambulance on the way to the hospital.

¶ 13    Schaumburg police officer Beelel Askar testified that he responded to a call of shots fired at approximately 3 p.m. on February 25, 2023. When Askar arrived at the scene, bystanders directed him to Spencer, who was kneeling in a driveway. Askar saw holes on both sides of Spencer's neck, which were bleeding, and other individuals pressing paper towels against his neck. Spencer said that his girlfriend had shot him and may still be in her house. Askar asked Spencer "if it was intentional or not" and he responded, "I don't know."

¶ 14    Askar and several other officers then spoke to defendant, who directed them to the revolver on a dresser in her bedroom. Askar identified a photograph of defendant's revolver on the bedroom

dresser. The photograph depicts the red and black unloaded revolver lying on top of an open gun case.

¶ 15    Askar interviewed defendant at her front door. Defendant stated that Spencer was a "friend[ ] with benefits" whom she had told to leave her house. After Spencer went downstairs to leave, defendant heard the garage door open. She went to investigate because she expected Spencer to leave through the front door, not the garage. In the garage, defendant found Spencer holding her revolver case against his chest, and the revolver was "point[ing] outside of the case." Defendant accused Spencer of stealing her revolver, which he denied. Defendant approached Spencer and he handed the revolver to her. Defendant noticed that the revolver was cocked. She asked Spencer why the revolver was cocked and said she did not know how to uncock it. "[A]t the moment [defendant] said that the gun fired and [Spencer] then left the garage." Defendant went back inside her house. Defendant appeared "unconcerned," "calm [and] unphased" during her interview with Askar. Askar did not observe any injuries to defendant, and she did not complain of any injuries. Following this interview, Askar transported defendant to the Schaumburg police station.

¶ 16    Schaumburg police forensic supervisor Lynette Johns testified that she responded to a call of shots fired at approximately 4 p.m. on February 25, 2023. Johns recovered defendant's revolver, its case, four live cartridges, and one cartridge casing from the top of defendant's bedroom dresser. Johns took photographs of the interior and exterior of defendant's house, defendant's garage, red stains on defendant's garage floor, driveway, and a white vehicle parked in the driveway, as well as a cigarette in the driveway. Johns also photographed defendant at the police station. Defendant did not complain of any injuries and Johns did not observe any. The State moved these photographs into evidence.

¶ 17   Schaumburg police detective Michael Recupito testified that he interviewed defendant at the police station on the afternoon of February 25, 2023. During the interview, Recupito "posit[ed] [a] theory" that defendant pointed the revolver at Spencer and she "respond[ed] in the affirmative by saying, 'Yeah'." At the end of the interview, Recupito swabbed defendant's hands for gunshot residue, but defendant said that she had washed her hands after Spencer was shot, which may have removed gunshot residue. Recupito also interviewed Spencer in the hospital on March 21, 2023. Spencer stated that he was outside the garage when he was shot, and he believed he had been shot two or three times.

¶ 18   Defendant moved for a directed finding, which the trial court denied.

¶ 19   Defendant testified that she and Spencer were in an off-and-on relationship for approximately two years. Spencer arrived at defendant's house at approximately 2 a.m. on February 25, 2023, spent the night with her, and awoke at approximately 2 p.m. Defendant told Spencer to leave because she needed to get ready for a friend's birthday party and because she wanted him out of the house before her daughter came home. Defendant denied that she and Spencer were arguing or that she swore at him. Spencer went back and forth between the bedroom and the bathroom several times. Defendant told him to hurry up through the closed bathroom door but did not "confront" him while he was in the bathroom.

¶ 20   Defendant confirmed she owned the revolver the State had moved into evidence. She usually stored the revolver and its ammunition in a dresser in her bedroom. However, on February 25, 2023, the revolver and ammunition were stored in a case in a cabinet in the garage. Defendant denied that she brandished the revolver when Spencer was in house.

¶ 21 Spencer packed his bag and went downstairs. Defendant thought he had left but she heard a noise in the garage. She went downstairs and found Spencer in the garage, so she opened the garage door and told him to leave. As defendant walked toward Spencer, she saw that he was holding her revolver case. The revolver's handle was protruding from the top of the case. Defendant told Spencer to give her the case, which he did. Defendant removed the revolver with her right hand while holding the case in her left arm. She placed the revolver on her open right palm at the level of her chest. Defendant testified as follows:

> "When [Spencer] gave me the gun, I noticed it was cocked and I immediately got nervous because I didn't know how to uncock it. I asked him a few times to uncock it for me. He wouldn't do it. And, like, as I was talking to with the gun in my hand, it just went off."

Defendant also testified that the revolver discharged while she was trying to uncock it with her left hand while holding the case to her chest with her left arm.

¶ 22 When the revolver discharged, there was no "kickback," and the revolver did not fall out of defendant's hand. The revolver firing did not burn defendant's hand. Spencer was approximately one foot away from defendant when the revolver discharged. Defendant denied that she pointed the revolver at Spencer, held the revolver out in front of her, touched the trigger, or tried to shoot Spencer. She acknowledged that the trigger had to be pulled for the revolver to fire, and that aside from this incident, she had never seen the revolver fire without the trigger being pulled.

¶ 23 After the revolver fired, Spencer covered his left ear, which defendant thought was a reaction to the loud sound, not a reaction to being shot. Spencer then walked through the open

garage door and toward the front of the house. Defendant took the revolver and its case inside, closed the interior door to the garage, and went upstairs to get her phone. She initially put the revolver and case in her bedroom dresser drawer, then unloaded the revolver and placed it on top of the case on the dresser. Although defendant did not realize Spencer had been shot, she called 911 from inside her house. While she was on the phone with 911, she looked outside and saw Spencer with a group of neighbors, still holding his left ear. Schaumburg police arrived and transported defendant to the police station.

¶ 24    In closing, the State argued that defendant intentionally shot Spencer, as evidenced by her following him into the garage, pointing the revolver at him, shooting him in the neck, and then running back into the house without trying to help him. Defendant waived closing argument.

¶ 25    The court said, "I'm going to take a moment to review the evidence, photographs and the weapons. If you want to come back in the side room, I'll take a look at it here." Neither party responded. After a short recess, the court ruled as follows:

"In court, [defendant] demonstrates that she's holding her hand out, chest high, gun laying flat on the palm of her right hand. She testifies both on direct and cross she never touches the trigger. She uses her left thumb on the hammer and the gun just goes off. I don't find that testimony to be credible. First of all, the gun is laying on her out-stretched palm and it went off. With the gun touching her hand, there would have been, most likely, some kind of burn or something of that nature from that gun firing. Assuming that didn't happen for some reason, two, a gun that fires that's just laying on someone's palm, the recoil would make that gun do something, fall off her hand, if she wasn't holding it in any manner.

But most importantly, the gun, itself, having examined it, if you pull the trigger back with both of my hands as hard as I can both my thumbs pushing, pushing, pushing, that handle will not move. It will not budge. The only way for it to budge is if you touch and pull the trigger. And she made that clear that she did not do that. So, I do not believe the gun was fired at *** Mr. Spencer as [defendant] testified."

The court found defendant guilty of aggravated battery but not guilty of attempt murder. The court explained that it had "doubt as to [defendant's] intent to kill" Spencer because she fired only one shot.

¶ 26    Defendant's initial motion for a new trial did not address the trial court's testing of the revolver. However, her supplemental motion for a new trial argued that the State introduced "no evidence, expert or lay, that the firearm was incapable of accidentally discharging when the hammer was in a cocked position" and "no evidence of how a revolver fires, what causes a bullet to discharge from the firearm, or any other specifics or expert opinions as to intentional or accidental discharges." Nevertheless, the trial court "decided, on its own, to take the firearm into chambers and examine it and come up with its own determination as to that issue." Defendant contended that "[t]he opinion given by the court after its examination of the firearm was equivalent to that of an expert witness and was not proper." In response, the State argued that there was "nothing *** improper with the trier of fact examining a piece of evidence that was properly admitted into trial."

¶ 27    The trial court denied both of defendant's motions for a new trial. As to the supplemental motion, the court explained that a trier of fact, whether a judge or a jury, is allowed to observe the evidence outside the presence of the parties. The court concluded that defendant's account of the

shooting was not credible based on the court's "observation of an item in evidence," *i.e.*, the revolver.

¶ 28    The trial court sentenced defendant to nine years in prison. Defendant filed a motion to reconsider sentence, which the court denied.

¶ 29    Defendant timely appealed.

¶ 30                                    II. ANALYSIS

¶ 31    Defendant argues that the trial court violated her right to due process by finding her guilty based on the court's testing of the revolver and its speculation about what injuries and recoil an accidental discharge may have caused.

¶ 32                                    A. Forfeiture

¶ 33    The State maintains that defendant has forfeited this claim of error because she did not object at trial and did not raise the issue until her supplemental motion for a new trial. Generally, to preserve an issue for appellate review, a defendant must raise the issue both at trial and in a written posttrial motion. *People v. Cregan*, 2014 IL 113600, ¶ 15.

¶ 34    Defendant did not object to the trial court's statement that it would "look at" the revolver and other evidence in a side room before ruling. We cannot fault defendant for that. There would be nothing objectionable about the court simply *looking at* a firearm the State had moved into evidence, which is what the court said it would do. However, the court did not indicate that it would personally test the mechanical operation of the revolver and attempt to recreate the accidental discharge defendant described, which is what the court actually did. There was no reason for defendant to anticipate that scenario and object in advance. See *People v. Heiman*, 286 Ill. App. 3d 102, 111 (1996) (because of the "practical difficulties involved in objecting to the trial

court's conduct, application of the waiver rule is less rigid if the basis for the objection is the trial court's conduct in a bench trial."). We do not find forfeiture based on defendant not objecting to the court stating it would "look at" "the evidence, photographs and the weapon[ ]" before ruling.

¶ 35    We also find that defendant was not required to object during the trial court's ruling. A defendant " 'need not interrupt a trial court to correct a trial court's misapprehension, after defense counsel has just argued the same to the court.' " *People v. Williams*, 2013 IL App (1st) 111116, ¶ 107 (quoting *People v. Mitchell*, 152 Ill. 2d 274, 324 (1992)). This principle typically applies to a trial court's mistaken recollection of the evidence. See, *e.g.*, *id.*; *People v. Roman*, 2013 IL App (1st) 102853, ¶ 20. However, we believe its logic extends to a trial court's consideration of matters that are not in evidence, such as burn injuries and recoil in this case. In both scenarios, the court is basing its ruling on something that neither party actually put into evidence.

¶ 36    Furthermore, "it would be unreasonable to expect counsel to interrupt the trial court during its explanation of its decision" due to "the general respect that lawyers typically show the trial court while the court is speaking." *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 85. In this case, it is difficult to identify when defendant "should" have objected during the trial court's ruling. The court began by framing its discussion of this point as an evaluation of defendant's credibility, which appeared to be proper. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) (a court presiding over a bench trial determines the witnesses' credibility). But the court then veered into speculation about issues on which neither party presented expert testimony—recoil and burn injuries from an accidental discharge—and discussed its own testing of the revolver, which neither party observed. Until the court finished its ruling, defendant could not have realized that the court was relying on matters not in evidence to find her guilty. See

*Montanez*, 2020 IL App (1st) 182239, ¶ 87. At that point, the case was over. See *id.* ¶ 88. Even if counsel had objected after the trial court finished ruling, doing so would have had the same effect as raising this issue in a posttrial motion, which defendant did. See *id.* Finding forfeiture under these circumstances would be inappropriate.

¶ 37    To the extent the State contends that defendant forfeited this issue by raising it in her supplemental motion for new trial as opposed to her initial motion, we disagree. Raising an issue in a supplemental motion for a new trial is sufficient to preserve that issue. *People v. Austin*, 2017 IL App (1st) 142737, ¶ 47. Defendant's supplemental motion raised this issue in detail and gave the State and the trial court a full opportunity to address it, which the State and the court did. Accordingly, we find that defendant did not forfeit this claim of error.

¶ 38                         B. Due Process Violation

¶ 39    We now consider whether the trial court violated defendant's right to due process by finding her guilty based on its own testing of the revolver and its speculation about what injuries and recoil an accidental discharge might have caused.

¶ 40    In a bench trial, the trial court determines the credibility of witnesses, weighs the evidence, draws reasonable inferences from the evidence, and resolves any conflicts in the evidence. *Siguenza-Brito*, 235 Ill. 2d at 228. However, the trial court may consider only the record developed during trial. *People v. Petrov*, 2023 IL App (1st) 160498, ¶ 54 (citing *People v. Wallenberg*, 24 Ill. 2d 350, 354 (1962)). Therefore, a " 'determination made by the trial judge based upon a private investigation by the court or based upon private knowledge of the court, untested by cross-examination, or any of the rules of evidence constitutes a denial of due process of law.' " *Id.* (quoting *Wallenberg*, 24 Ill. 2d at 354). On appellate review, we presume that the trial court

considered only admissible evidence, and " 'this assumption will be overcome only if the record affirmatively *** establishe[s] that the court's finding rests on a private investigation of the evidence.' " *Id.* ¶ 55 (quoting *People v. Tye*, 141 Ill. 2d 1, 26 (1990)). We review *de novo* whether the trial court violated the defendant's right to due process by relying on information outside the record. *Id.* (citing *People v. Dameron*, 196 Ill. 2d 156, 171-72 (2001)).

¶ 41    The record in this case affirmatively establishes that the trial court tested the revolver's mechanical operation outside the presence of the parties. It also establishes that the court's testing of the revolver was the primary basis for the court's rejection of defendant's accidental discharge theory. The court concluded that the accidental discharge defendant described was mechanically and physically impossible based on the court's attempt to recreate that scenario. Therefore, the court conducted testing of the revolver's operation that was not subject to cross-examination, and that testing was decisive to the court's determination of guilt. That was error. See *id.* ¶¶ 55-56.

¶ 42    The court compounded this error by speculating as to what injuries an accidental discharge might have caused and how the revolver may have recoiled in that scenario. These matters are not common knowledge on which a court may rely in evaluating the evidence. Rather, experts must provide opinions about firearms' operation and recoil. See, *e.g.*, *Scatchell v. Board of Fire and Police Commissioners for Village of Melrose Park*, 2022 IL App (1st) 201361, ¶ 29 (firearms expert testified to what kind of recoil and injury a shotgun would or would not have caused); *People v. Lamprey*, 79 Ill. App. 3d 1065, 1070 (1979) (police officer with extensive small arms experience could testify to mechanical operation of a firearm's trigger and firing pin); *People v. Beasley*, 54 Ill. App. 3d 109, 113 (1977) (firearms examiner and gunsmith testified as to whether

a firearm could have accidentally discharged). No expert witnesses testified in this case and the trial court was not free to substitute its speculation for expert testimony.

¶ 43    *People v. White*, 183 Ill. App. 3d 838 (1989), guides our reasoning. In that case, the trial court revoked the defendant's probation based on his alleged commission of aggravated battery. *Id.* at 838-39. The revocation hearing involved a dispute about whether the defendant cut the victim's wrist with a knife, as the State alleged, or the victim injured himself by falling on a broken glass bottle, as the defendant claimed. *Id.* at 839. The trial court rejected the defendant's accidental injury theory based on its examination of the victim's injury, concluding that the location and pattern of the wound indicated that it was caused by a knife, not broken glass. *Id.* at 840. On appeal, this court found plain error because "the ability to examine a cut and determine [which] instrument that made [the cut] is beyond the province of common knowledge;" rather, "[t]he parties could only have introduced this evidence through a qualified expert." *Id.* at 841. Accordingly, the trial court "erred in considering facts not in evidence." *Id.* The trial court in this case committed similar error by basing its ruling on speculation about what injuries and recoil an accidental discharge of a revolver would cause without expert testimony to support those conclusions.

¶ 44    The State cites *People v. Gilbert*, 68 Ill. 2d 252 (1977), to argue that the trial court's testing of the revolver in this case was proper. *Gilbert* states that, as a rule, "it is improper for the trier of fact to conduct experiments or private investigations which have the effect of producing evidence that was not introduced at trial." *Id.* at 259. That is precisely what the trial court did in this case. Outside the presence of the parties, and without telling the parties it would do so, the trial court tested whether the revolver could have fired as defendant described. However, neither party

introduced evidence as to whether the accidental discharge defendant described was mechanically possible. The rule of *Gilbert* supports our conclusion in this case.

¶ 45    Moreover, the facts of *Gilbert* are distinguishable. *Gilbert* was a murder case in which the defendant claimed that the victim was holding a shotgun pointed downward. *Id.* at 253-56. The defendant grabbed the stock of the shotgun, and when the victim swung at him with her elbow, the barrel of the gun struck a door and the stock struck a refrigerator, causing the shogun to discharge and kill the victim. *Id.* at 256. The trial court examined the shotgun and concluded that, "*irrespective of the mechanical functioning of the gun*, [the court] did not believe that the shooting could have occurred in the manner described by the defendant" based on "the manner in which the gun was being carried by the deceased, the length and other physical characteristics of the gun and the angle and location of the wound." (Emphasis added.) *Id.* at 260. Our supreme court affirmed, finding that the shotgun's mechanical operation had no bearing on the trial court's ruling. *Id.* By contrast, in this case, the trial court expressly stated that it tested the revolver's mechanical operation and concluded, based on its testing of the revolver's mechanics, that it could not have operated as defendant testified.

¶ 46    The State also cites *People v. Kurena*, 87 Ill. App. 3d 771 (1980), in which this court affirmed the defendant's murder conviction over his contention that the jury conducted improper experiments with the evidence during deliberations. *Id.* at 773. The jury made a cardboard replica of the knife used in the murder and used it to determine whether the victim's wounds resulted from a right or left-handed stab and whether the defendant could have concealed the knife in his sleeve. *Id.* at 776. But in this case, the trial court personally tested the mechanical operation of the actual firearm involved in the incident, which a jury would never be allowed to do. See *People v.*

*Caldwell*, 2024 IL App (1st) 221073-U, ¶ 120 (Oden Johnson, J., dissenting) ("[A] jury would never have been allowed to retire to the jury room with semi-automatic weapons and live ammunition to see what magazines fit into what guns, for example. They would have been forced to rely on the expert testimony the State did, or did not, provide."). *Kurena* is not analogous to this case and does not compel us to approve the trial court's conduct by affirming its decision.

¶ 47     The State's contention that the trial court in this case "conducted no private investigation but rather viewed the physical evidence" is simply not true. The trial court judge described physically handling—not just viewing—the revolver by "pull[ing] the trigger back with both of [his] hands as hard as [he] can both [of his] thumbs pushing, pushing, pushing." From that physical experimentation, the court concluded that the "handle *** will not move. It will not budge. The only way for it to budge is if you touch and pull the trigger." Accordingly, we find that the trial court violated defendant's right to due process by finding her guilty based on its improper experimentation with the revolver and speculation about what injuries and recoil an accidental discharge would have caused.

¶ 48                               C. Harmless Error

¶ 49     Finally, the State argues that the trial court's error was harmless because the evidence against defendant was "overwhelming[ ]" and the trial court found her not credible based on her inconsistent accounts of how the revolver discharged. "Although a defendant may be denied due process of law when the circuit court makes a decision based upon a private investigation, the error, even of constitutional dimension, is rendered harmless if the evidence overwhelmingly favors conviction." (Internal citation omitted.) *People v. Gleash*, 209 Ill. App. 3d 598, 609 (1991).

¶ 50    We find that the trial court's error was not harmless because the evidence that defendant intentionally shot Spencer was not overwhelming.[1] No eyewitnesses corroborated Spencer's testimony that defendant pointed the revolver at him from approximately six feet away and fired. No forensic evidence or expert testimony supported the State's intentional shooting theory or discredited defendant's accidental discharge theory. A reasonable factfinder could believe that defendant's behavior in the immediate aftermath of the incident—calling 911, directing police to the revolver, and speaking with Askar—suggested that she thought the shooting was an accident, not that she had committed a serious violent crime. The recording of defendant's 911 call suggests that she knew only that the revolver had fired but did not know whether Spencer had been shot. A reasonable factfinder may not be compelled to find that defendant intentionally shot Spencer.

¶ 51    We acknowledge that defendant's account of when and how the revolver accidentally discharged was not entirely consistent. At times, defendant claimed that the revolver fired while she was trying to uncock it, but at other times, she suggested that the revolver simply discharged while it was lying in her open palm. She also said "Yes" in response to the 911 call taker's question whether Spencer shot himself. But, even if these statements were inconsistent, none of them suggested that defendant pointed the revolver at Spencer from across the garage and fired intentionally as the State alleged.[2]

¶ 52    What is decisive is that the court described its experimentation with the revolver as the "most important[ ]" factor in rejecting defendant's accidental discharge theory. Given the emphasis

---

[1]We also note that the trial court expressed doubt about defendant's intent to commit murder.

[2]Recupito testified that, during her interview, defendant agreed with his suggestion that she must have pointed the revolver at Spencer. However, the court considered this statement only for purposes of impeachment and not as evidence that defendant did in fact point the revolver at Spencer.

the trial court placed on its improper testing of the revolver, we cannot conclude that the court's error was harmless. Rather, it was the crux of the court's finding of guilt. Accordingly, we reverse defendant's aggravated battery conviction and remand for a new trial. On remand, this case should be assigned to a different judge who has not tested the revolver. See *Petrov*, 2023 IL App (1st) 160498, ¶ 99 (ordering assignment to a new judge upon retrial where the trial court erred by considering matters not in evidence in finding the defendant guilty).

¶ 53                                III. CONCLUSION

¶ 54     For the foregoing reasons, we reverse defendant's conviction for aggravated battery and remand the matter for a new trial.

¶ 55     Reversed; cause remanded.